## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYES, DIVISION, IBT <br><br> Plaintiff, <br><br> NATIONAL MEDIATION BOARD <br><br> and <br><br> CSX TRANSPORTATION, INC. <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> )    Case No.1:06-CV-01532 CKK <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

### MEMORANDUM IN OPPOSITION TO MOTION OF THE
### NATIONAL MEDIATION BOARD FOR DISMISSAL OF COMPLAINT

This memorandum is submitted by the  Brotherhood of Maintenance of Way Employes Division/IBT("BMWED") in opposition to the motion of the National Mediation Board ("NMB") for dismissal of the claims in BMWED's complaint which assert that the NMB violated the Railway Labor Act, 45 U.S.C. §153 First(1) ("RLA") by failing and refusing to authorize funding to pay an arbitrator who was appointed sit with the National Railroad Adjustment Board ("NRAB") to hear certain cases and make awards in certain disputes between BMWED and CSX Transportation ("CSXT"), and by purporting to void the appointment of the Arbitrator to decide the cases referred to him.

The NMB moves for dismissal of BMWED's complaint, asserting that BMWED lacks standing, that BMWED cannot sue the NMB over its actions and that the lawsuit is somehow precluded by the arbitration process for "minor disputes" under the RLA. None of these claims has merit

1

# FACTS

**A. The Disputes That Gave Rise To This Case**

This case arises in connection with a number of disputes between BMWED and CSXT over CSXT's contracting-out of maintenance of way work despite a provision in the parties' agreement that states that specified maintenance of way tasks are "reserved to BMWE members". Shortly after the Agreement was entered in 1999, CSXT provided BMWED with numerous notices regarding plans to contract-out work that the Agreement reserved to BMWED members.

Declaration of Steven V. Powers ¶¶4-7. BMWED believed that CSXT's actions constituted an abrogation of the agreement and a "major dispute" over changes in the agreement in violation of the RLA. CSXT responded that it believed that its contracting-out was permitted by the 1999 Agreement and that its interpretation of the agreement was at least arguable under the terms of the agreement such that the disputes between the parties were "minor disputes" under the RLA that must be arbitrated pursuant to Section 3 of the RLA (45 U.S.C. §153). CSXT brought an action against the Union in the Middle District of Florida which held that the disputes were minor and should be handled through the contractual grievance procedure and if necessary to the National Railroad Adjustment Board under RLA Section 3; and the Court enjoined a strike. Id ¶8.

Since 2000, BMWED has progressed over 1000 contracting-out claims through the contractual grievance procedure. Over 576 cases that were not resolved in on-the property grievance handling that were progressed by the BMWED are now before the NRAB. Approximately 33 cases have been heard in arbitration and 24 awards have been issued. Among the contracting-out cases that were not resolved by BMWED and CSXT were cases that were docketed as Docket Nos. 38317, 38318, 38330, 38331, 38333, 38581, 38622, 38623, 38642, and 38654. The Third Division of the NRAB declared that it was deadlocked on those cases. Powers Declaration ¶¶9-10.

**B. The NMB's Appointment of Arbitrator Cohen, The NMB's Failure To Authorize Funding For Him To Hear The Cases, CSXT's Removal Of The Cases From Mr. Cohen And The NMB's Voiding Of His Appointment**

After the NRAB deadlocked on the ten cases, on June 24, 2005, BMWED requested that the NMB appoint an arbitrator under RLA Section 3 First(l) to break the deadlock and make an award. Powers Declaration ¶11. On June 28, 2005, NMB assigned Arbitrator Edward Suntrup to hear the cases, however, Arbitrator Suntrup later resigned, citing a heavy caseload and an inability to hear the cases before the end of the NMB's fiscal year, which always brought funding delays. *Id.* ¶ 12. On August 12, 2005, NMB assigned Arbitrator Donald Cohen to hear the cases. *Id.* ¶ 13. On October 13, 2005, a carrier member of the NRAB wrote to Arbitrator Cohen stating that the carrier members were delighted that he had been appointed to hear the cases but asserting that the carriers believed he should not hear the cases until "some time in 2007" because the cases were allegedly taken "out of order". *Id.* ¶ 16.

Arbitrator Cohen then wrote to NMB on October 26, 2005, to ask if he had the authority to set a hearing date. *Id.* ¶ 17. On November 7, 2005, NMB responded that it was uncertain about its fiscal year 2006 budget and no arbitration hearings were budgeted at that time. *Id.* ¶18. NMB did not answer Arbitrator Cohen's question regarding whether he had authority to schedule a hearing. *Id.* The answer to that question did not come until nearly six months later when, on April 28, 2006, the NMB sent a letter to Arbitrator Cohen in which it provided him with a copy of a letter sent to another arbitrator on August 10, 2005, in response to that arbitrator's inquiry regarding the same objection by a carrier. *Id.* ¶ 19. That letter to Arbitrator Gerald Wallin authorized the arbitrator to schedule a hearing regardless of the carriers' assertions about the order in which cases should be scheduled. *Id.*

On May 19, 2006, after he had finally received the NMB's April 28, 2006, correspondence,

Arbitrator Cohen wrote to the union and carrier members of the NRAB informing them that he had considered their positions regarding the scheduling of the matter; that he considered the decision to involve procedural issues that were within his jurisdiction; and that his finding was that the matters were properly before him. *Id.* ¶ 20. On June 6, 2006, Arbitrator Cohen informed the parties that he was prepared to schedule a hearing. *Id.* ¶ 21.

Despite Arbitrator Cohen's May 19, 2006, ruling, counsel for CSXT wrote to Arbitrator Cohen on June 7, 2006, reiterating its argument that the cases should not be scheduled for a hearing because they were supposedly taken out of order. *Id.* at ¶ 22. On June 8, 2006, a representative of the carrier members of the NRAB wrote to Arbitrator Cohen, repeating the claim that he should not proceed to hear these cases and requesting that he defer consideration of a hearing date until after CSXT's issues were presented to and decided by the full NRAB. *Id.* ¶ 23. On June 12, 2006, BMWED wrote to Arbitrator Cohen stating that the cases assigned to him were identified as deadlocked by the NRAB, that the RLA provides for appointment of a neutral to sit with the NRAB to break a deadlock, and that Mr. Cohen had been appointed pursuant to Section 3 First (l) to sit with the NRAB to make awards on the deadlocked cases. BMWED also asserted that there is no NRAB rule concerning arbitration of deadlocked cases in a "first-in/first-out" order as claimed by CSXT and the carrier members of the NRAB, that actual NRAB practice is inconsistent with the alleged rule or practice, that the full NRAB would not meet for several months, and that the RLA mandate that he proceed with the arbitration could not be superceded by NRAB rules even if the carriers were correct in their contentions about the alleged order of processing rule. *Id.* ¶ 24.

On June 20, 2006, Arbitrator Cohen wrote to the representatives of the union and carrier members of the Third Division of the NRAB and informed them that, after further consideration of the parties legal arguments, he had concluded that he had authority to schedule the cases that had

been assigned to him, and he offered dates for the hearing. *Id.* ¶ 27. On June 28, 2006, Arbitrator Cohen informed the parties that he had set a hearing for July 19, 2006. *Id.* ¶ 28.

However, counsel for CSXT had written to Arbitrator Cohen on June 27, 2006, asking that he recuse himself from hearing the cases. *Id.* ¶ 29. BMWED responded to the request by asserting that Arbitrator Cohen had no conflict of interest and should proceed with hearing the grievances. *Id.* at ¶30. On June 28, 2006 Arbitrator Cohen advised counsel that he had considered CSXT's request, but had determined that there was no reason that he should recuse himself. *Id.* at ¶31.

On June 30, 2006, Arbitrator Cohen informed the representatives of the union and carrier members of the NRAB that the hearing could not take place in July because the NMB had not authorized any funding to pay him for any services he might perform during the month of July. *Id.* at ¶ 32. Arbitrator Cohen offered several dates in August. *Id.* BMWED and CSXT both responded that they were available on August 23 and Arbitrator Cohen set the hearing for August 23, 2006. *Id.* ¶¶33-34.

Once again, despite correspondence and numerous calls from BMWED, NMB failed to authorize funding for arbitrator in August. *Id.* ¶¶35-38.

On August 14, 2006, CSXT wrote to the NRAB Third Division to withdraw certain cases from the NRAB, including those that were set for hearing before Arbitrator Cohen for August 23, 2006. *Id.* ¶39. On August 15, 2006 the NMB wrote to Arbitrator Cohen advising him that "CSX Transportation, Inc. informed the NRAB that [the cases referred to him] have been withdrawn and placed on a public law board pursuant to Section 153 Second of the Act. For this reason, the certificate of appointment [August 12, 2005] is declared void." *Id.* at ¶40.

On October 4, 2006, after BMWED filed its complaint in this case, the NMB wrote to Arbitrator Cohen stating that the August 15 letter was "purely ministerial" "to acknowledge an

5

apparent withdrawal of these cases by CSXT". The NMB further stated that there was now a dispute "as to whether the withdrawal was proper and/or effective under the law", that the NMB "takes no position on the propriety of the withdrawal" and that once the issue is decided "in some forum other than the NMB", "the NMB will proceed accordingly". The October 4, 2006 NMB letter did not reverse the voiding of Mr. Cohen's appointment or reappoint Mr. Cohen generally, or even contingent on the outcome of the decision by "some forum other than the NMB". *Id.* ¶41.

## C. BMWED's Claims of Injury As A Result Of The NMB's Actions and Inaction

BMWED asserts that if the NMB had authorized funding for Mr. Cohen to proceed with the arbitration at any point after he was selected as the neutral to sit with the NRAB to make awards in these cases, the cases would have been heard and decided in accordance with Section 3 First(l); certainly they would have been heard on August 23, 2006 once both parties said they were available and Mr. Cohen scheduled the hearing for that day.. BMWED further asserts that if the NMB had not voided the appointment of Mr. Cohen to decide the cases referred to him, Mr. Cohen could have scheduled another date to hear those cases to make an award, but once the NMB voided his appointment, he could no longer do so. After the NMB voided his appointment, Mr. Cohen no longer had authority to hear the cases because he was only appointed to hear these cases as a neutral referee to sit with the NRAB to break the deadlock and issue awards. BMWED contends that the NMB's October 4, 2006 letter did not change anything because the NMB did not reverse its prior action and Arbitrator Cohen is no longer appointed as the neutral to hear the cases that were assigned to him. *Id* ¶¶42-43.

BMWED alleges that and its members have been adversely affected by the actions of the NMB and CSXT in several ways. The NMB clearly delayed resolution of the claims assigned to Mr. Cohen because they would have been heard on August 23, 2006, and now it is not known when they

will be heard. This means that decisions on the contract questions and the claims of BMWED's members in those cases will be further delayed. *Id* ¶43-44, 48a-b.

BMWED also asserts that BMWED and its members have been deprived of the right to have a neutral member appointed by the NMB make an award in the cases assigned to him as is provided by Section 3 First (l) for the NMB to appoint and compensate a referee to make an award when the NRAB deadlocks. A neutral referee assigned to make awards in cases on which the NRAB deadlocked was removed after the neutral had made two procedural rulings in the case that CSXT did not like, this deprived BMWED and its members of their rights under Section 3 First (l). Moreover, BMWED contends that, as a party that regularly brings cases to the NRAB which regularly deadlocks, BMWED has an interest in the integrity and regularity of the process. If a party can remove cases from a referee appointed to sit with the NRAB to make an award after the referee has made rulings adverse to that party, and the NMB voids appointments in such circumstances, that would undermine the legitimacy of the arbitration process on which both carriers and unions depend for resolution of contract interpretation disputes; and to which rail unions are restricted for resolution of such disputes. Id ¶¶48c-e.

## ARGUMENT

### A. BMWED Has Standing to Bring This Suit Against the NMB

The NMB claims that BMWED lacks constitutional standing to bring this suit. The agency asserts that BMWED has suffered no cognizable injury in fact; that there is no causal connection between any injury to the BMWED and any action of the NMB; and that there is no judicial remedy available for the alleged injury. NMB Brief at 9-12. However, BMWED does have standing to bring this cause of action.

The three elements necessary for a plaintiff to establish constitutional standing are: (1) that

the plaintiff suffered an injury in fact; (2) that the defendant's actions caused the plaintiff's injury; and (3) that the injury is redressable by a favorable decision of the court. *Brotherhood of Locomotive Engineers and Trainmen v. Surface Transportation Board*, 457 F.3d 24, 27 (D.C. Cir. 2006) (*citing Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

**1. BMWED And Its Members Have Suffered Injury In Fact**

With regard to the first element of standing, the Court of Appeals for the District of Columbia Circuit recently noted that, "Constitutional standing requires that a plaintiff show 'injury in fact,' which the Supreme Court has defined as 'an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.'" *National Family Planning and Reproductive Health Association, Inc. v. Gonzales*, — F.3d. — , 2006 WL 3289048 at *2 (D.C. Cir.) (*quoting Lujan*, 504 U.S. at 560).

In its motion to dismiss NMB has glossed over the facts and the impact of its actions on BMWED and its members. The claims to be arbitrated were not simply neglected and left languishing on the NRAB's backlogged docket. To the contrary, the NRAB had declared them deadlocked. BMWED requested appointment of an arbitrator under RLA Section 3 First(l) which states that the NMB shall appoint a neutral referee upon request once the NRAB deadlocks for the referee to break the deadlock and make an award; Section 3 First (l) also states that the NMB shall pay the referee. Although the NMB responded by appointing a referee, CSXT and the carrier members of the NRAB engaged in a series of stalling maneuvers and asserted a number of objections which were rejected by Arbitrator Cohen. But the NMB did not authorize funding for a hearing, although it is statutorily obligated to do so. At the time CSXT decided to withdraw the cases from Arbitrator Cohen he had already accepted the appointment and had issued two separate procedural rulings with regard to the case (*i.e.* that the cases were properly before him and that he need not

8

recuse himself from hearing the cases), and had scheduled a hearing on the merits of the cases. Not coincidentally, these two procedural rulings were not favorable to CSXT's position on those issues. When CSXT sent its letter withdrawing the cases, a hearing was pending and set to go forward only nine days later. The only reason that the previously scheduled hearing did not take place was that, in violation of Section 3 First (1), the NMB had failed to make funding available to pay Arbitrator Cohen as required by that provision.

It was not CSXT alone that effectively put an end to the arbitral process by withdrawing from the disputes from Mr. Cohen after receiving a couple of unfavorable rulings. But at the time CSXT acted, Arbitrator Cohen was still the arbitrator appointed to hear these cases and he was still mandated to make an award. Had NMB provided the funding required by statute to pay him, absent legal action by CSXT, there would have been nothing to prevent him from proceeding with a hearing, even without CSXT's participation. The decision of one party to back away from the matter would not have stripped Arbitrator Cohen of his authority to hear the disputes and issue a decision. It was the subsequent act of the NMB of sending a letter to Arbitrator Cohen informing him that his appointment was **void** that stripped Arbitrator Cohen of his authority to hear the case and dismissed the matter from his jurisdiction. Thus, both the NMB's failure to fund the arbitrator, and the NMB's subsequent disruption of the arbitral process by voiding his appointment injured the BMWED and its members-- as they will suffer delay in  resolution of the claims assigned to Mr. Cohen, and decisions on interpretation of the contract questions at issue are still undecided.

Additionally, BMWED and its members have been deprived of the right to have a neutral member appointed by the NMB make an award in the cases assigned to him after he made two rulings that CSXT did not like; this deprived BMWED and its members of their rights under Section 3 First (l) to a decision by a neutral appointed by the NMB to make an award. And as a party that

regularly brings cases to the NRAB which regularly deadlocks, BMWED is injured by the perversion of the process when a party removes cases from a referee after the referee has made rulings adverse to that party, and the NMB voids the appointment of that referee.

NMB insists in its brief that its actions were merely ministerial. NMB Brief at 11-12. This ignores the fact that the NMB improperly delayed the process and refused to fund an appointed arbitrator in violation of the express command of the RLA. Such malfeasance by the NMB should not be ignored; and such disregard of the statute it administers should not be accepted based on the NMB's erroneous claim that its actions were merely innocuous ministerial acts. The NMB has statutory duties to appoint a referee to break a deadlock at the NRAB by making an award, and to pay the appointed referee for doing so. The NMB has failed to cite any provision of the Act that would allow it to refuse to pay an appointed referee, thereby preventing him from making an award. Certainly BMWED's complaint on its face alleges that the NMB violated the Act and the NMB has not shown that its actions were permitted by the Act. And, as is shown above, the facts demonstrate that BMWED was injured because the NMB refused to pay the referee as required. Such injury can be remedied by a declaration that the NMB's actions were indeed unlawful. As the D.C. Circuit recently observed, "Although it is natural to think of an injury in terms of some economic, physical, or psychological damage, a concrete and particular injury for standing purposes can also consist of the violation of an individual right conferred on a person by statute. Such an injury is concrete because it is of 'a form traditionally capable of judicial resolution...'" *Zivotosfsky v. Secretary of State*, 444 F.3d 614, 619 (D.C. Cir. 2006) (*quoting Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 220-21 (1974)).

In addition to the NMB's failure to fund the arbitrator, its act of voiding Arbitrator Cohen's appointment upon CSXT's decision to remove the cases from Mr. Cohen and to send them to a PLB

to be created later further undermined the statutory processes. The NMB's decision to void Arbitrator Cohen's appointment improperly and unfairly empowered CSXT to cancel an arbitration after it became displeased with the arbitrator's procedural rulings.   Had the NMB not voided the appointment of Mr. Cohen he could have proceeded to schedule another date for an arbitration. Clearly, BMWED was injured by the NMB's actions because it was the NMB that removed Mr. Cohen from these cases and prevented him from sitting with the NRAB to decide them. Certainly, a party to an arbitration is injured if the other party can walk away and obtain a different arbitrator because that party becomes displeased by a ruling. And such harm plainly flows from the NMB because a disgruntled union or carrier would no longer need to fear the outcome of an ex parte hearing or default judgment if the NMB would routinely oblige by voiding the arbitrator's jurisdiction and clearing the way for that party to move on to some other venue where the decision maker might be more sympathetic.  This undermining of the arbitration process is not a harmless ministerial act as NMB claims.  The injury to the party who remains engaged in the arbitration is clear.  Indeed, if the NMB's conduct is adjudged harmless, then the injury to the integrity of the RLA's remedial mechanism would be substantial.

The NMB argues that there was no harm to BMWED because the union is wrong in asserting that the August 15 letter precluded Mr. Cohen from making an award. The NMB asserts that its letter did not purport to have any effect at all. NMB Brief at 10-11.However, the NMB most certainly did preclude Mr. Cohen from making an award–it voided his appointment, this rendered him unable to make an award. Regardless of whether the NMB thinks it purported to do anything, it refused to fund the arbitration as required and its letter declared the appointment void. The NMB asserts (Brief at 10 n. 4) that its October 4 letter clarified that the August 15 letter was purely ministerial. But despite how the NMB wants to characterize its letter after the fact, the letter on its face voided the

appointment. And the October 4 letter did not reverse the "voiding" or reinstate Mr. Cohen. At present Mr. Cohen cannot act in accordance with the August 2005 appointment under Section 3 First(l), cannot hear the cases as he was empowered to by the Act and he cannot make an award. The NMB also asserts that it did not refuse to authorize funding for Mr. Cohen (NMB Brief at 12 n.6) but Mr. Cohen made multiple requests for funding under a statutory provision that says the NMB shall pay the neutral. In particular, the NMB did not respond to Arbitrator Mr. Cohen's July request for funding for a hearing scheduled in late August. And the NMB did not assert any defect in the request or any general funding freeze, the NMB simply did not provide funding. Under a statutory scheme that mandates compensation for referees, there is no way to characterize the NMB's actions other than as a refusal to provide funding.

The NMB claims that the alleged injury is not sufficiently concrete because BMWED does not allege that Mr. Cohen would have undertaken to hear the cases in the absence of the NMB's letter, and it is speculative to assume that Mr. Cohen would have gone forward after CSXT had acted to remove the cases from him. NMB Brief at 11. But Mr. Cohen already had a hearing scheduled for August 23 after both sides reported their availability on that day. This hearing was scheduled despite other objections advanced by CSXT, so it is not merely speculative to assert that Mr. Cohen would have proceeded had he not received the NMB's letter. In any event, it is clear that because the NMB refused to fund the arbitration and voided Mr. Cohen's appointment, Mr. Cohen could not proceed as planned, even if he intended to. To the extent that there are "unknowns" here, it is because the NMB made it impossible for Mr. Cohen to go forward in accordance with the Act.

Moreover, that after even further additional delay, the BMWED may yet have the underlying disputes heard before a different arbitrator in a different arbitration arrangement is immaterial. BMWED and its members had a right to an award from the arbitrator appointed to break the

deadlock, not a different referee after CSXT ousted the appointed neutral, and not many months after a hearing was already scheduled. Furthermore, the NMB's actions here have negated the Section 3 First(l) process, if the NMB's action is allowed to stand it will undermine the integrity of that process in future disputes. The integrity of the arbitration process is especially undermined when the NMB permits a party to remove a case from an appointed arbitrator after adverse initial rulings (or any time prior to issuance of an award on the merits).

In *International Brotherhood of Electrical Workers v. Interstate Commerce Commission*, the Court of Appeals for the District of Columbia Circuit found that the union plaintiff had standing to challenge a finding by the Interstate Commerce Commission ("ICC") that it had jurisdiction to review an arbitral award because, "Even if the resolution of this issue is seen as 'collateral' to the merits of the case, the union has been adversely affected by the Commission's holding." 862 F.2d 330, 334 (D.C. Cir. 1988). The Court further explained, "Because the petitioner in this case will be forced to litigate future arbitration awards before the ICC, it has a personal stake sufficient to meet the demands of article III." Id. So too in this case the BMWED, being required to arbitrate minor disputes, after having given up its right to strike in favor of resort to mandatory arbitration with neutrals appointed by the NMB, has an interest in the integrity of the statutory processes and the enforcement of the RLA.

In another recent case finding that the plaintiff had standing, the D.C. Circuit noted that where the plaintiff was seeking to enforce a procedural right, he was not required to prove that the procedural remedy–in that case the right to legal representation at a parole hearing–would have materially impacted the outcome of the underlying hearing. *Settles v. United States Parole Commission*, 429 F.3d 1098, 1103 (D.C. Cir. 2005). Similarly, the BMWED need not prove that Arbitrator Cohen would have ruled in its favor if given the opportunity to hear the underlying

disputes. It is sufficient for the BMWED to show that NMB's actions caused it to suffer the loss of the opportunity to present its case to Arbitrator Cohen.

## 2. The Injury To BMWED And Its Members Is Fairly Traceable To The NMB

The second prong of the test for constitutional standing requires that the defendant's actions caused the plaintiff's injury. "[T]hat injury must be 'fairly traceable' to the defendant's conduct and likely to be 'redressed by a favorable decision.'" *Worth v. Jackson*, 451 F.3d 854, 857 (D.C. Cir. 2006) (*quoting Lujan*, 504 U.S. at 560-561). "When a plaintiff is the 'object of [government] action (or forgone action)...there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.'" *Zivotofsky*, 444 F.3d at 618.

If the NMB had provided funding for Arbitrator Cohen to proceed, instead of voiding his appointment, and if the NMB had simply informed Arbitrator Cohen that CSXT intended to withdraw from the process, then there could have been merit to NMB's instant claim that its actions were merely ministerial and incapable of inflicting harm on the BMWED. Instead, NMB violated the statute by failing to provide funding for Arbitrator Cohen to hear the merits of the case. This only added to the initial unnecessary and improper delay caused by NMB's failure to respond, for more than six months, to Arbitrator Cohen's inquiry regarding whether he was authorized to schedule a hearing. It was this delay that CSXT attempted to leverage as an excuse to withdraw from the process. Yes, part of the problem here is that CSXT attempted to remove the cases from Arbitrator Cohen pursuant to RLA Section 3 Second. But it was the NMB that took the additional step of voiding Arbitrator Cohen's appointment, thereby giving conclusive weight to CSXT's decision to extricate itself from an arbitration process that did not seem to be going its way. CSXT would not have had the power to bypass the arbitration absent the help of NMB. Thus, BMWED's

injuries–the delay and cancellation of an ongoing arbitration process, and withdrawal of BMWED's cases from an appointed arbitrator–were certainly  the result of NMB's failure to comply with the statute and its interference in the arbitral process. All of the harms alleged here flow in large part from the actions of the NMB.[1]

### 3. The Injury To BMWED And Its Members Can Be Remedied By This Court

The final element a plaintiff must show in order to establish standing is that the injury is capable of being remedied by a favorable decision of the court.  In this case BMWED's injury is easily redressable by this Court.  As the D.C. Circuit found in *Settles*, where there is a procedural defect in a governmental proceeding causing injury to the plaintiff, the redressability of the alleged injury is clear where a decision of the court ordering a new hearing would remedy the plaintiff's procedural injury. 429 F.3d 1098, 1103.

In its motion to dismiss, the NMB makes the mystifying claim that there is nothing stopping Arbitrator Cohen from, even now, conducting a hearing if he thought it was appropriate to do so. NMB Brief at 10-11. This is not possible, however, because the NMB unequivocally voided his appointment.  Arbitrator Cohen does not have jurisdiction over this matter to sit with the NRAB to make an award independent of the NMB's appointment and funding.  He did not come to have

---

[1] The NMB has argued that BMWED asserts a right to have cases heard by a particular arbitrator. That is not correct. BMWED has never demanded or sought the right to pick particular arbitrators to hear cases. BMWED does, however, assert a right to proceed before an arbitrator who has already been appointed to make an award, particularly when the arbitrator has already made procedural rulings in the cases. Again, if the NMB had authorized funding for Mr. Cohen to proceed with the arbitration at any point after he was selected as the neutral to sit with the NRAB to make awards in these cases, the cases would have been heard and decided in accordance with Section 3 First(l). In particular, after the questions asked by Arbitrator Cohen were answered by the NMB in the Spring of 2006, after Arbitrator Cohen considered and denied CSXT's various requests for delays and request for recusal, and after Arbitrator Cohen scheduled a hearing on August 23, 2006 once both parties indicated their availability on that day, the cases would have been heard on August 23, 2006 if the NMB had authorized funding for Mr. Cohen to hear the cases on that day.

jurisdiction over these matters as a free and independent arbitrator appointed by the parties. To the contrary, he serves, by appointment of the NMB, as a referee over the proceedings of the NRAB. Until he is reappointed by the NMB and until the NMB makes funding available to pay him, Arbitrator Cohen has no jurisdiction or means to hear the underlying disputes. It is precisely this reason that the BMWED has brought the NMB before this Court. The Court has the power to declare that the NMB violated the RLA by refusing to provide the funding necessary to pay for Arbitrator Cohen's services and by voiding his appointment. It is also this clear cut request for relief that establishes the third prong of the test for constitutional standing. BMWED's injury is redressable by an order of this Court.

The NMB argues that BMWED lacks standing because a declaratory order is prospective in nature and therefore would not redress the past harm to BMWED. NMB Brief at 13. But, if the Court grants BMWED the relief it seeks– declaring that the NMB was obliged to fund the Cohen arbitration and could not void his appointment– then the Court will have determined that the NMB's action were unlawful. It is reasonable to assume, indeed it should be expected, that if this Court declares the agency's actions unlawful, the agency will reverse itself-reinstating Mr. Cohen's appointment and authorizing funding for him to proceed with a hearing. There is no reason to assume that the NMB will simply ignore a declaratory order of the Court. If for some reason the agency does ignore such an order, BMWED could seek further relief as necessary based on the judgment, in accordance with the Declaratory Judgment Act, 28 U.S.C. §2202. BMWED submits that this Court certainly can grant relief to BMWED based on its complaint such that the injuries alleged could be remedied by an order of this Court.

BMWED respectfully submits that it has shown that it satisfies all of the requirements for standing to bring this litigation and that there is no merit to the NMB's motion to dismiss for lack

of standing.[2]

## B. BMWED Has Properly Sued the National Mediation Board And The Court Has Jurisdiction Over BMWED's Claims Against the NMB

The NMB claims that it is not a proper party to this suit because, in appointing an arbitrator, it was merely performing a ministerial function and that it cannot be sued for doing so. This claim is based on a fundamentally erroneous characterization of what happened here. NMB Brief at 17.

BMWED does not dispute that the simple act of appointing an arbitrator is a ministerial function. The NMB possesses no discretion with regard to that activity. Indeed, by operation of the statute, that action is supposed to be automatic. But, it is not the act of appointment that BMWED is challenging in this instant suit. Instead, BMWED is challenging the NMB's failure to fund the arbitrator and its act of voiding Arbitrator Cohen's appointment. The failure to fund the arbitrator was in direct conflict with the statutory command that the NMB "shall fix and pay the compensation

---

[2] BMWED also notes that it has associational standing to bring this claim on behalf of its members. The Supreme Court has held that "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977) (*citing Warth v. Seldin*, 422 U.S. 490 (1975)). In order to meet the first prong of the test, BMWED "must demonstrate that at least one of their members satisfies the 'irreducible constitutional minimum of standing.'" *American Library Ass'n v. Federal Communications Comm'n*, 401 F.3d 489, 492 (D.C. Cir. 2005) (*quoting Lujan*, 504 U.S. at 560). Here, the underlying grievances that were before Arbitrator Cohen are grievances that individual members of the BMWED brought to challenge improper subcontracting by CSXT. The grievances assert a loss of work to the members, in violation of the collective bargaining agreement. These individual members have a financial stake in the outcome of these grievances because they stand to win back pay if their grievances are sustained in arbitration. Moreover, interest is not usually available in these grievances, these members suffer a direct injury resulting from the improper delay of the arbitration process. Second, the BMWED's pursuit of this matter is germane to its purpose as an organization which is to represent its employees in their dealings with CSXT and to enforce the collective bargaining agreement it negotiated with CSXT on behalf of its members. Third, neither the claim here not the relief requested require participation of the individual members-BMWED is their collective bargaining representative and it is representing them in their claims to be arbitrated. Granting the relief requested by BMWED will redress the harms to its members.

of such referees." 45 U.S.C. § 153 First (l). The NMB is required to appoint a referee and to pay the

referee; its failure to do so violates the Act and is indeed ultra vires. The NMB's refusal to pay the

arbitrator is an action that it is not authorized to take; the Act plainly says it shall pay. In refusing to

pay, the NMB exercised discretionary authority it does not have-it cannot decide whether or not to

pay an arbitrator appointed under Section 3 First(l)

> The United States Court of Appeals for the District of Columbia Circuit has:

>> ...described the distinction between "discretionary" and "ministerial" functions as follows: "'Generally speaking, a duty is discretionary if it involves judgment, planning, or policy decisions. It is not discretionary [i.e., ministerial] if it involves enforcement or administration of a mandatory duty at the operational level, even if professional expert evaluation is required.'"

*KISKA Construction Corp. v. Washington Metropolitan Area Transit Authority*, 321 F.3d 1151, 1159

n.9 (D.C. Cir. 2003) (*quoting Beatty v. Washington Metropolitan Area Transit Authority*, 860 F.2d

1117, 1127 (D.C. Cir. 1998) (*quoting Jackson v. Kelly*, 557 F.2d 735, 737-738 (10th Cir. 1977))); *see*

*also, Taylor v. Washington Metropolitan Area Transit Authority*, 109 F.Supp.2d 11, 16 (D.D.C.

2000) (*quoting United States v. Gaubert*, 499 U.S. 315, 325 (1991)) ("The Supreme Court has stated

that a discretionary function 'is one that involves choice or judgment.'"). In order to refuse to pay

Mr. Cohen the NMB had to make a judgment or decision not to pay him despite the language of the

Act. This was plainly an exercise of discretion; discretion that the NMB did not have.

> NMB's act of voiding Arbitrator Cohen's appointment was also the result of a discretionary

judgment by the NMB regarding the legal consequence of CSXT's decision to withdraw from the

arbitration process. After making this discretionary determination, NMB acted on its decision by

notifying Arbitrator Cohen that his appointment was void.

> Far from imposing a mandatory statutory duty to void an arbitrator's appointment in certain

circumstances, the RLA makes no provision for NMB to ever void an arbitrator's appointment.

Thus, NMB voided Arbitrator Cohen's appointment in the complete absence of any statutory authority to do so. Again, the NMB exercised discretion it did not have.

Where the NMB acts beyond the scope of its statutory authority, its activity is subject to judicial review. The D.C. Circuit ruled *en banc* that the NMB is subject to suit when it exercises authority it does not have. *Railway Labor Executives Ass'n v. National Mediation Board* ("*RLEA v. NMB*"), 29 F.3d 655 (D.C. Cir. 1994). In that case the D.C. Circuit declared that the NMB could not initiate representation proceedings after a carrier filing, when the Act provides that a proceeding may be begun on petition of a party to a dispute (*i.e.* employees and their representatives), and that carriers are not parties to such disputes. *Id.* at 658. The NMB had created procedures whereby it could *sua sponte* initiate a representation investigation in the wake of railroad mergers and acquisitions even though Section 2 Ninth of the RLA permits the NMB to investigate representation disputes only "upon request of either party to the dispute." 45 U.S.C. § 152 Ninth. The court noted that, "the Board has no freewheeling authority to act as it sees fit with respect to anything denoted a 'representation dispute.'" *Id*. The Court harbored no doubt that NMB's merger procedures "constitute[d] a bald and unsupportable arrogation of power not conferred by the RLA." *Id*. at 663.

As in this case, in *RLEA v NMB*, the NMB acted without any specific RLA authorization for its action. The Court rejected the notion that the NMB could infer the authority to act as it did from its general powers in the Act and its role with respect to representation disputes; as well as the NMB's assertion that its new regulation was permissible because the Act did not expressly forbid the NMB from initiating representation proceedings on its own or pursuant to a carrier's filing. *Id* at 666. The Court stated "...the Board would have us *presume* a delegation of power from Congress absent an express *withholding* of such power. This comes close to saying that the Board has the power to do whatever it pleases merely by virtue of its existence, a suggestion that we view to be

incredible". (*Id.* at 659, emphasis in original) and that "Unable to link its assertion of authority to any statutory provision, the Board's position in his case amounts to the bare assertion that it possesses *plenary* authority to act within a given area because Congress has endowed it with *some* authority to act in that area. We categorically reject that suggestion." *Id.* at 670, emphasis in original. With respect to reviewability of the NMB's actions and its arguments that it had previously enjoyed immunity from suit in representation cases the Court found that existing precedent limiting the scope of judicial review of NMB's actions was based on the assumption that NMB was acting within the scope of its statutory authority. *Id.* at 662. The court held that review is available when the NMB acts "in excess of its delegated powers", when there is "a gross violation of the Railway Labor Act" or beyond its authority to act. *Id.* at 661, 662, 664.

*CSX Transportation, Inc. v. National Mediation Board*, 2005 WL 2297554 (D.D.C. 2005), is particularly apt here because it involved a claim by CSXT that the NMB had violated Section 3 Second. In that case, CSXT complained that the NMB had exceeded its statutory authority by removing a number of cases that CSXT and BMWED had agreed to separately submit to various PLBs from those PLBs and placing those cases before a new PLB established by the NMB *Id*. The Court found that there was no authority for the NMB to establish a PLB or to change the "jurisdictional scope" of a PLB. *Id.* at *6. This Court stated:

> There is no statutory language permitting defendant to establish a PLB. *Id*. [45 U.S.C. § 153 Second]. Defendant becomes involved only at a party's request, and only to designate a member to represent a party, or to appoint a neutral. *Id*. ...There is no statutory language permitting defendant to decide or change the jurisdictional scope of a PLB. Once the parties have established a PLB for certain cases, the PLB has primary and exclusive jurisdiction over those cases. *United Transp. Union [v. National R.R. Passenger Corp.*], 882 F.Supp. [1] at 3 [(D.D.C. 1995)].

*Id*. at *6. (Emphasis added.) The Court further noted that, "there is no language in 45 U.S.C. § 153

Second that allows defendant to determine the cases to be heard by a PLB or even suggests that defendant has discretion over the matter." *Id*. at *9. The court granted CSXT's motion for summary judgment "[b]ecause defendant's Order is a gross violation of the RLA..."

Similarly in this case, there is no statutory language permitting the NMB to refuse to pay an arbitrator appointed under Section 3 First(l) , nor is there language permitting the NMB to void an arbitrator's appoint under that provision; and there is nothing in the statute that "even suggests that defendant has discretion over the matter." *Id*. Thus, NMB's actions in this matter are no more insulated from judicial review than they were in *RLEA v. NMB* and *CSX Transportation v. NMB*.

Despite the existence of this powerful authority that is directly on point, NMB has not attempted to justify its actions by claiming they were within its statutory authority. Instead, the NMB has cited several cases that it claims support its assertion that it is not a proper party to this lawsuit. NMB Brief at 17-19. The first of these cases is *Ozark Air Lines, Inc. v. National Mediation Board*, 797 F.2d 557 (8th Cir. 1986).  In *Ozark*, the Eighth Circuit held that:

> Because the NMB lacked any power in this case and merely provided an arbitrator for the use of the disputants, no justiciable controversy existed between the NMB and Ozark.. . . Reducing the NMB's immunity and forcing it to decide whether each dispute is arbitrable would significantly undercut its impartiality and "impair its ability to constitute a significant force for conciliation."

Id. at 564 (*quoting International Association of Machinists and Aerospace Workers v. National Mediation Board*, 425 F.2d 527, 539 (D.C. Cir. 1970)).  This case is simply not on point because, as explained above, the BMWED is not challenging NMB's ministerial act of appointing an arbitrator, which was the NMB's only action at issue in *Ozark*.  In fact, the court's concern that NMB should not be held responsible for entertaining questions of arbitrability supports BMWED's argument that NMB must not be permitted to terminate an arbitration process based on its

determination that the withdrawal of one party should result in the voiding of the arbitrator's jurisdiction. Such activity would require the sort of exercise of discretion that the *Ozark* court, in an effort to preserve NMB's neutrality, held the NMB did not have.

Similarly, the NMB's reliance on *Maine Central Railroad v. BMWE*, 657 F.Supp. 971 (D. Maine 1987) is misplaced because that decision again concerned the NMB's appointment of an arbitrator, not its refusal to pay an arbitrator or its "unappointment" of an arbitrator. The district court relied upon *Ozark* for the proposition that "the Board was not a proper party to a dispute where its only role was to appoint an arbitrator." *Id.* at 988 (*citing Ozark*, at 563). This case is no more useful to NMB than the *Ozark* case.

NMB's heavy reliance on a footnote in *United Transportation Union v. National Mediation Board*, 1993 WL 764220 (D.D.C.), is equally puzzling. In that case, this Court granted NMB's motion to dismiss because, in the interest of comity, it wished to avoid interference with the jurisdiction of another federal court:

> Plaintiff's case is an attempt to launch a collateral attack on the pending Texas litigation. A decision by this Court holding that the NMB was without authority to create a panel of arbitrators would unduly interfere with resolution of the Texas case. The District Court held that a panel of arbitrators should hear the case. If the Fifth Circuit affirms the District Court then a decision here for plaintiff on the merits would fly in the face of the Fifth Circuit's decision.

*Id.* at *2. In so holding, the Court dismissed the plaintiff's case and dropped a footnote stating that, because NMB had appointed a panel of arbitrators in response to another district court's order, it was acting in a ministerial capacity and the plaintiff's grievance was properly with the carrier and not the NMB. Id. at *2 n.1. Thus, not only does this case not hold what NMB alludes that it does, even the footnote cited by NMB is not relevant because, in appointing an arbitration panel, the NMB was acting within its statutory authority. In this case, the BMWED is challenging activity by NMB that

22

is beyond its statutory authority.

The NMB claims that *Springfield Terminal Railway Co. v. United Transportation Union*, 711 F.Supp. 665 (D. Maine 1989), is a "particularly instructive decision." NMB Brief at 17. Actually, the case is not instructive at all because it involved a claim to set aside an arbitration award and to prospectively enjoin the NMB from certain contacts with a new neutral. The court found that the review provisions of the RLA are the exclusive remedy for challenging arbitration awards issued under the RLA and "the National Mediation Board is never a proper defendant in an action to challenge an arbitration award by the NRAB." *Id*. at 665, Quoting *Radin v. United States*, 699 F.2d 681, 687 (4th Cir. 1983), the court noted that "the NMB has 'no connection with or control over the adjudicatory functions of the NRAB, which are accorded adequate review in the district courts.'" *Id*. at 666 n.3. The Court also found that the complaint did not actually allege any violation of law by the NMB; rather each claim was for vacation of the award and the NMB was merely cited as taking certain actions which allegedly influenced and thus biased the arbitrator. Under such circumstances, it is not surprising that the court found that the NMB was not a proper defendant-it was not charged with violating the RLA or exceeding its jurisdiction and the action was actually one to challenge the award an action that did not require the NMB to be a party.

NMB also relies on *Radin. v. United States*, *supra.*. In *Radin*, an employee whose discharge was sustained by an NRAB regional arbitration board initiated an action against the NRAB and the NMB asserting that he was not given notice of the hearing in his case. The Fourth Circuit first noted that the employee's claim was actually one for vacation of the award which he could have brought against the carrier under Section 3 First(q) had he filed it timely. The Court then concluded that he could not bring the case against the NRAB and the NMB because the United States had not waived sovereign for damages claims against either entity. The Court also rejected the employee's argument

that he could sue the NMB as the "parent" agency of the NMB because the employee had

mischaracterized the relationship between the two agencies, noting that the NMB merely funds the

NRAB and provides certain other administrative support. 699 F. 2d at 684-686. The court concluded

that if the employee was unhappy about the award he should have sought to vacate it under Section

3 First (q). *Id* at 686. For the same reasons that *Springfield Terminal* is not applicable to this case,

*Radin* also fails to lend support to NMB's position in this case which asserts that the NMB violated

the RLA by failing to act in a manner required by the Statute and taking action that the RLA did not

permit.

Because the NMB's actions were ultra vires, the NMB is a proper party to this suit.  The

cases cited by NMB are not on point and do nothing to insulate it from judicial review in the instant

circumstances.

### C. BMWED's Challenge To The NMB's Violation Of Section 3  First (l) Is Not An Affront To The RLA Arbitration Process, Is Not Barred By The Existence Of That Process And Is Not Precluded By The Statutory Provisions For Review Of Arbitration Awards

Notwithstanding the various decisions holding that the NMB actions are subject to judicial

review when the NMB exceeds its authority and acts contrary to law, the NMB argues that

BMWED's complaint does not state a claim against the agency because the complaint relates to

minor disputes. The NMB has cited a number of decisions that hold that minor disputes are to be

kept out of the courts and that they must be resolved exclusively through RLA arbitration processes.

NMB Brief at 13-14. But none of those decisions is pertinent here. BMWED does not ask the Court

to decide the merits of the underlying disputes. BMWED challenges the NMB's failure to fund the

Cohen arbitration as required by law and the NMB's voiding of the appointment of Mr. Cohen; these

claims assert violations of law, not violations of agreements. As the Supreme Court held in

*Consolidated Rail Corp. v. Ry. Labor Execs. Ass'n*, 491 U.S. 299, 306 (1989), minor disputes

"relate[] either to the meaning or proper application of a particular provision with reference to a specific situation or an omitted case..." BMWED's claims against CSXT over its persistent contracting out in violation of the parties' agreement have been determined to be minor disputes that must be decided in arbitration; BMWED's claim against the NMB does not involve interpretation or application of a collective bargaining agreement with a carrier, but rather a violation of the statute by a federal agency. As just shown, the courts plainly have jurisdiction over such claims. Indeed, in *CSXT v NMB* this court exercised jurisdiction to adjudicate CSXT's complaint that the NMB had violated the RLA by its removal of cases from established PLBs and creation of a new PLB to hear those cases-cases which involved other contracting-out claims under the BMWED-CSXT agreement. The decisions holding that minor disputes may only be heard in arbitration and may not be heard in court are plainly inapposite here.

The NMB then argues that the Court lacks jurisdiction because it is asserted that BMWED is bypassing the exclusive statutory procedure for review of RLA arbitration awards. NMB Brief at 14-16. However, the statutory provision for review of awards permits review only "for failure of the division to comply with the requirements of this chapter, for failure of the order to conform, or confine itself, to matters within the scope of the division's jurisdiction, or for fraud or corruption by a member of the division making the order".45 U.S.C. § 153 First (q)

 In *Union Pacific R. Co. v. Sheehan*, 439 U.S. 89 (1978)*,* the Supreme Court stated that *"* The dispositive question is whether the party's objections to the Adjustment Board's decision fall within any of the three limited categories of review provided for in the Railway Labor Act.  Section 153 First [q] unequivocally states that the 'findings and order of the [Adjustment Board] shall be conclusive on the parties' and may be set aside only for the three reasons specified therein.  We have time and again emphasized that this statutory language means just what it says." *Id*. at 93, citations

25

omitted. There is no basis in the statute and controlling precedent for a party to utilize the procedure for review of arbitration awards to challenge the NMB's actions in failing to authorize funding for an arbitrator or to void his appointment after he began work on the case. This procedure is designed for challenges to the manner in which an arbitration is conducted by the arbitration board, to arbitrators exceeding their jurisdiction and failure of arbitrators to base their awards on the parties' agreements. Furthermore, the parties to such a procedure are the employees or their union and the carrier (45 U.S.C. §153 First(q), *Radin v. United States,* 699 F. 2d at 686), there is no basis in this provision for a party to challenge the NMB and for the NMB to participate to defense of its actions or inaction. These clear and well-known limitations on the RLA arbitration review process show that there simply is no basis in the statute for the NMB's assertion that the process precludes BMWED's complaint against the agency.

The NMB has cited *Radin v. United States, supra.* and *Springfield Terminal, supra.* as supporting this proposition. NMB Brief at 15. However, as is explained above, both of those cases are inapposite because they concerned actual challenges arbitration awards; in neither case was it argued that the NMB failed to perform a statutory duty or exceeded its authority. The NMB has cited a statement in *Springfield Terminal* that if the NMB's actions were found to have tainted the arbitration, that would be grounds for overturning the award. NMB Brief at 15, *citing Springfield Terminal* at 666. But again, the complaint in that case was not that the NMB violated the RLA by failing to act in a manner required by the Statute and taking action that the RLA did not permit. Rather, the claim there was that the award itself was "tainted by bias of the arbitrator" and that this allegedly was caused in part by NMB contacts with the arbitrator. The Court stated that "It is plain from reading the complaint that Plaintiff was not harmed directly by the NMB's alleged actions in intermeddling and scheduling the arbitration or by its alleged failure to appoint and/or compensate

the neutral members. Rather, Plaintiff's complaint is concerned with how the alleged actions of the NMB affected the arbitration award". 771 F Supp. at 665. Thus the conclusion that the plaintiff in that case was limited to an action Section 153 First(q) does not support the proposition that BMWED can or must assert its claims against the NMB here under Section 3 First(q).[3]

The NMB also asserts that BMWED should be barred from bringing this action against the NMB because the Union has requested appointment of a procedural neutral in response to CSXT's proposal for establishment of a new PLB to hear the cases assigned to Mr. Cohen, along with many other cases. The NMB notes that Section 3 Second provides that a procedural neutral may determine the jurisdiction of a new PLB. NMB Brief at 16. However, as is explained by Mr. Powers (Declaration ¶ 47) BMWED expressly stated its continued position that neither CSXT nor the NMB could withdraw the cases from Arbitrator Cohen, that issue would have to be decided by this Court, and that if CSXT continued to argue that the cases assigned to Mr. Cohen should be included among those submitted to the PLB, BMWED would advise the procedural neutral that he/she has no jurisdiction to decide that question. *See also* Powers Ex. 26. It must be remembered that CSXT's request for creation of a new PLB included dozens of other cases. BMWED did not contest CSXT's ability to create a new board for cases that had not yet been assigned to an arbitrator, but did argue that additional cases (that also had not been assigned to arbitrators) should be submitted to the new

---

[3] BMWED also notes that the District of Maine's conclusion that the issue of whether the NMB's actions biased the arbitrator could be raised under Section 3 First(q) was predicated on the notion that a party can obtain judicial review of an arbitration award based on a claim of denial of due process. 711 F. Supp at 666 n. 2. However, many courts have held that denial of due process is not a ground for review of an award under the RLA. *E.g. Henry v. Delta Air Lines*, 759 F. 2d 870, 873, *citing Union Pacific v. Sheehan, supra.* 439 U.S. at 93. *See also Shafii v PLC British Airways*, 22 F. 3d 59, 62 (2d Cir 1994), holding that such a claim is available, but noting that three circuits say yes, and three circuits say no. Thus, even if the NMB had correctly characterized BMWED's cause of action here, the NMB has suggested that BMWED's only recourse would be one that is recognized by only half the circuits that have addressed the issue.

board; BMWED also differed with CSXT about various other terms for the new board, such as the frequency with which the board would hear cases and the scope of the record before the board. *Id*. Thus, BMWED did not somehow concede that the procedural neutral would have authority to assign the Cohen cases to the new board and BMWED's request for a procedural neutral is not inconsistent with its position here-the procedural board may establish a board to decide cases other than the ten that were assigned to Mr. Cohen,  may determine which of the cases proposed for the new board other than the Cohen cases may be put before the board (the smaller group proposed by CSXT or the larger group proposed by BMWED) and may determine the procedural rules for the new board. Finally, BMWED notes that the there would be no duplication of litigation if this Court hears BMWED's complaint since the Court would hear statutory claims, and the new PLB would here contractual claims. Indeed, as CSXT notes (CSXT Brief at 13 n. 9), arbitrators do not have authority to adjudicate statutory claims. *Hawaiian Airlines v. Norris*, 512 U.S. 246, 254-255 (1994); *Brotherhood of Maintenance of way Employes  v. Atchison Topeka & Santa Fe Ry. Co*., 138 F. 3d 635, 642 (7th Cir. 1997). While a procedural board could decide whether a new PLB should hear only the cases proposed by CSXT,  also the cases proposed by BMWED or something in between, the procedural board could not confer on the PLB jurisdiction to deal with statutory question or to hear cases that should not be before it because of a violation of law.

Thus, the fact that the underlying disputes between the parties are minor disputes and that those cases will be decided by arbitrators, not by courts, does not mean that this Court is without jurisdiction to hear BMWED's statutory claims.

## CONCLUSION

For all of the foregoing reasons, BMWED respectfully submits that the NMB's motion for dismissal of BMWED's complaint against the NMB should be denied.

Respectfully submitted,


_____/s/_____
Richard S. Edelman
D.C. Bar No. 416348
Brenda C. Zwack

Of Counsel:                          O'Donnell, Schwartz & Anderson, P.C.
William A. Bon, Esq.                  1900 L Street, N.W., #800
General Counsel                      Washington, DC 20036
Brotherhood of Maintenance           (202) 898-1824
of Way Employes                      fax (202)-429-8928
20300 Civic Center Dr. Suite 320
Southfield, MI 48076-4169
(248) 948-1010


December 8, 2006

Attorneys for Plaintiffs Brotherhood of Maintenance of Way Employes Division/IBT