## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BROTHERHOOD OF MAINTENANCE | ) |
| OF WAY EMPLOYES, DIVISION, IBT | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No. 1:06-cv-01532- CKK |
| NATIONAL MEDIATION BOARD | ) |
| | ) |
| and | ) |
| | ) |
| CSX TRANSPORTATION, INC. | ) |
| | ) |
| Defendants. | ) |
| | ) |

## MEMORANDUM IN OPPOSITION TO MOTION OF
## CSX TRANSPORTATION FOR DISMISSAL OF COMPLAINT

This memorandum is submitted by the Brotherhood of Maintenance of Way Employes Division/IBT("BMWED") in opposition to the motion of CSX Transportation ("CSXT") for dismissal of BMWED's complaint against CSXT that the carrier violated the Railway Labor Act, 45 U.S.C. §151 *et seq.* ("RLA") when the carrier acted to remove certain cases from arbitration before a neutral referee who had been designated by the National Mediation Board ("NMB") to sit with the National Railroad Adjustment Board ("NRAB") to hear and decide those cases and make awards in those cases, and that CSXT's actions violated its duty to exert every reasonable effort to settle all disputes.

### INTRODUCTION

BMWED submits that it has stated a claim for relief that can be granted by this Court in alleging that CSXT violated the RLA because its actions negated operation of Section 3 First (l) of the RLA (45 U.S.C. §153 First (l)), which directs appointment of a neutral to break a deadlock on

the NRAB to decide the case and issue an award, by preventing the appointed neutral from making

an award. CSXT also violated the RLA because its circumvention of resolution of the disputes by

the appointed neutral, beginning with repeated objections to hearing the cases and culminating in

removal of the cases from the referee, constituted failure to "exert every reasonable effort to ... settle

all disputes" as required by R LA Section 2 First (45 U.S.C. §152 First). BMWED further submits

that there is no merit to CSXT's contention that its reliance on RLA Section 3 Second, which allows

parties to move cases from the NRAB to special arbitration boards after they have been pending for

more than one year, necessarily defeats BMWED's cause of action under Section 3 First(l). The

cases at issue here had actually been assigned to a neutral who had already rendered rulings in those

cases. Additionally, Section 3 Second was not enacted or intended to permit what CSXT has done,

and CSXT's reading of Section 3 Second would create a conflict between it and Section 3 First(l).

Moreover, regardless of what Section 3 Second might otherwise allow, CSXT's actions violated the

overarching duties imposed by Section 2 First that the parties exert every reasonable effort to settle

their disputes.

## FACTS

### A. The Disputes That Gave Rise To This Case

This case arises in connection with a number of disputes between BMWED and CSXT over

CSXT's contracting-out of maintenance of way work despite a provision in the parties' agreement

that states that specified maintenance of way tasks are "reserved to BMWE members".  Shortly after

the Agreement was entered in 1999, CSXT provided BMWED with numerous notices regarding

plans to contract-out work that the Agreement reserved to BMWED members.

Declaration of Steven V. Powers ¶¶4-7. BMWED believed that CSXT's actions constituted an

abrogation of the agreement and a "major dispute" over changes in the agreement in violation of the

RLA. CSXT responded that it believed that its contracting-out was permitted by the 1999 Agreement and that its interpretation of the agreement was at least arguable under the terms of the agreement such that the disputes between the parties were "minor disputes" under the RLA that must be arbitrated pursuant to Section 3 of the RLA (45 U.S.C. §153). CSXT brought an action against the Union in the Middle District of Florida which held that the disputes were minor and should be handled through the contractual grievance procedure and if necessary to the National Railroad Adjustment Board under RLA Section 3; and the Court enjoined a strike. Id ¶8.

Since 2000, BMWED has progressed over 1000 contracting-out claims through the contractual grievance procedure. Over 576 cases that were not resolved in on-the-property grievance handling that were progressed by the BMWED are now before the NRAB. Approximately 33 cases have been heard in arbitration and 24 awards have been issued. Among the contracting-out cases that were not resolved by BMWED and CSXT were cases that were docketed as Docket Nos. 38317, 38318, 38330, 38331, 38333, 38581, 38622, 38623, 38642, and 38654. The Third Division of the NRAB declared that it was deadlocked on those cases. Powers Declaration ¶¶9-10.

**B. The NMB's Appointment of Arbitrator Cohen, The NMB's Failure To Authorize Funding For Him To Hear The Cases, CSXT's Removal Of The Cases From Mr. Cohen And The NMB's Voiding Of His Appointment**

After the NRAB deadlocked on the ten cases, on June 24, 2005, BMWED requested that the NMB appoint an arbitrator under RLA Section 3 First(l) to break the deadlock and make an award. Powers Declaration ¶11. On June 28, 2005, NMB assigned Arbitrator Edward Suntrup to hear the cases, however, Arbitrator Suntrup later resigned, citing a heavy caseload and an inability to hear the cases before the end of the NMB's fiscal year, which always brought funding delays. *Id*. ¶ 12. On August 12, 2005, NMB assigned Arbitrator Donald Cohen to hear the cases. *Id*. ¶ 13. On October 13, 2005, a carrier member of the NRAB wrote to Arbitrator Cohen stating that the carrier members

were delighted that he had been appointed to hear the cases but asserting that the carriers believed

he should not hear the cases until "some time in 2007" because the cases were allegedly taken "out

of order". *Id.* ¶ 16.

Arbitrator Cohen then wrote to NMB on October 26, 2005, to ask if he had the authority to

set a hearing date. *Id.* ¶ 17. On November 7, 2005, NMB responded that it was uncertain about its

fiscal year 2006 budget and no arbitration hearings were budgeted at that time. *Id.* ¶18. NMB did

not answer Arbitrator Cohen's question regarding whether he had authority to schedule a hearing.

*Id.* The answer to that question did not come until nearly six months later when, on April 28, 2006,

the NMB sent a letter to Arbitrator Cohen in which it provided him with a copy of a letter sent to

another arbitrator on August 10, 2005, in response to that arbitrator's inquiry regarding the same

objection by a carrier. *Id.* ¶ 19. That letter to Arbitrator Gerald Wallin authorized the arbitrator to

schedule a hearing regardless of the carriers' assertions about the order in which cases should be

scheduled. *Id.*

On May 19, 2006, after he had finally received the NMB's April 28, 2006, correspondence,

Arbitrator Cohen wrote to the union and carrier members of the NRAB informing them that he had

considered their positions regarding the scheduling of the matter; that he considered the decision to

involve procedural issues that were within his jurisdiction; and that his finding was that the matters

were properly before him. *Id.* ¶ 20. On June 6, 2006, Arbitrator Cohen informed the parties that he

was prepared to schedule a hearing. *Id.* ¶ 21.

Despite Arbitrator Cohen's May 19, 2006, ruling, counsel for CSXT wrote to Arbitrator

Cohen on June 7, 2006, reiterating its argument that the cases should not be scheduled for a hearing

because they were supposedly taken out of order. *Id.* at ¶ 22. On June 8, 2006, a representative of

the carrier members of the NRAB wrote to Arbitrator Cohen, repeating the claim that he should not

proceed to hear these cases and requesting that he defer consideration of a hearing date until after CSXT's issues were presented to and decided by the full NRAB. *Id*.¶23. On June 12, 2006, BMWED wrote to Arbitrator Cohen stating that the cases assigned to him were identified as deadlocked by the NRAB, that the RLA provides for appointment of a neutral to sit with the NRAB to break a deadlock, and that Mr. Cohen had been appointed pursuant to Section 3 First (l) to sit with the NRAB to make awards on the deadlocked cases. BMWED also asserted that there is no NRAB rule concerning arbitration of deadlocked cases in a "first-in/first-out" order as claimed by CSXT and the carrier members of the NRAB, that actual NRAB practice is inconsistent with the alleged rule or practice, that the full NRAB would not meet for several months, and that the RLA mandate that he proceed with the arbitration could not be superceded by NRAB rules even if the carriers were correct in their contentions about the alleged order of processing rule. *Id*. ¶ 24.

On June 20, 2006, Arbitrator Cohen wrote to the representatives of the union and carrier members of the Third Division of the NRAB and informed them that, after further consideration of the parties legal arguments, he had concluded that he had authority to schedule the cases that had been assigned to him, and he offered dates for the hearing. *Id*. ¶ 27. On June 28, 2006, Arbitrator Cohen informed the parties that he had set a hearing for July 19, 2006. *Id*. ¶ 28.

However, counsel for CSXT had written to Arbitrator Cohen on June 27, 2006, asking that he recuse himself from hearing the cases. *Id*. ¶ 29. BMWED responded to the request by asserting that Arbitrator Cohen had no conflict of interest and should proceed with hearing the grievances. *Id*. at ¶30. On June 28, 2006 Arbitrator Cohen advised counsel that he had considered CSXT's request, but had determined that there was no reason that he should recuse himself. *Id*. at ¶31.

On June 30, 2006, Arbitrator Cohen informed the representatives of the union and carrier members of the NRAB that the hearing could not take place in July because the NMB had not

authorized any funding to pay him for any services he might perform during the month of July. *Id*. at ¶ 32. Arbitrator Cohen offered several dates in August. *Id*. BMWED and CSXT both responded that they were available on August 23 and Arbitrator Cohen set the hearing for August 23, 2006. *Id*. ¶¶33-34.

Once again, despite correspondence and numerous calls from BMWED, NMB failed to authorize funding for arbitrator in August. *Id*. ¶¶35-38.

On August 14, 2006, CSXT wrote to the NRAB Third Division to withdraw certain cases from the NRAB, including those that were set for hearing before Arbitrator Cohen for August 23, 2006. *Id*. ¶39. On August 15, 2006 the NMB wrote to Arbitrator Cohen advising him that "CSX Transportation, Inc. informed the NRAB that [the cases referred to him] have been withdrawn and placed on a public law board pursuant to Section 153 Second of the Act. For this reason, the certificate of appointment [August 12, 2005] is declared void." *Id*. at ¶40.

On October 4, 2006, after BMWED filed its complaint in this case, the NMB wrote to Arbitrator Cohen stating that the August 15 letter was "purely ministerial" "to acknowledge an apparent withdrawal of these cases by CSXT". The NMB further stated that there was now a dispute "as to whether the withdrawal was proper and/or effective under the law", that the NMB "takes no position on the propriety of the withdrawal" and that once the issue is decided "in some forum other than the NMB", "the NMB will proceed accordingly". The October 4, 2006 NMB letter did not reverse the voiding of Mr. Cohen's appointment or reappoint Mr. Cohen generally, or even contingent on the outcome of the decision by "some forum other than the NMB". *Id.* ¶41.

## **ARGUMENT**

It is well-established that the Federal Courts have jurisdiction to enforce the commands of the RLA particularly when there is no other mechanism available for enforcement of RLA rights and

duties. *Virginian Ry. v. System Federation No. 40,* 300 U.S. 515, 545 (1937)*; Brotherhood of RR. Trainmen v. Chicago River & Indiana RR,.* 353 U.S. 30, 35-40 (1957)*, Chicago & North Western Transp. Co. v. UTU*, 402 U.S. 570, 578-579 (1971)*; Trans World Airlines v. Ind. Fed. Of Flight Attendants,* 489 U.S. 426, 441-442 (1989)*; Railway Labor Executives Ass'n v. National Mediation Board*, 29 F.3d 655, 661 (D.C. Cir. 1994). Here, BMWED's complaint alleges that CSXT has violated two provisions of the RLA and there is no other mechanism available for enforcement of those provisions. CSXT's motion does not challenge the availability of judicial enforcement of Sections 3 and 2 First, nor does CSXT claim that the Act provides some other forum for enforcement of those provisions. Rather, CSXT argues that its actions were permitted by Section 3 Second so BMWED has no claim for relief under Sections 3 First(l) and 2 First. CSXT Brief at 2, 9, 14. However, BMWED has alleged violations of those provisions; its allegations, accepted as true for purposes of CSXT's motion, set forth claims enforceable under the RLA; and CSXT has not shown, and cannot show that Section 3 Second immunizes it from suit under Sections 3 First(l) and 2 First.

## A. BMWED's COMPLAINT STATES A VALID CLAIM FOR RELIEF UNDER THE RLA IN ASSERTING THAT CSXT'S ACTIONS VIOLATED RLA SECTION 3 FIRST

### 1. RLA Section 3 First (l) Requires Appointment Of Neutrals When The NRAB Deadlocks For The Neutrals To Make Awards To Settle The Disputes, So A Challenge To CSXT'S Removal of Cases From An Appointed Neutral And Prevention Of His Issuance Of An Award Is A Claim For Enforcement Of The RLA Which The Court Can Remedy

RLA Section 3 First (l) provides that when the NRAB cannot render a decision because of deadlock or inability to secure a majority vote, a neutral referee will be selected to sit with the NRAB to decide the case. This provision further ensures that cases will not languish and will be decided, by providing that if the NRAB does not or cannot agree on a neutral within ten days, either party may seek appointment of a  neutral by the NMB which shall within ten days appoint a neutral to sit with

the NRAB and make an award.[1] By its plain terms, Section 3 First (l) provides for appointment of referees to decide deadlocked cases to render awards; and the mechanism is designed to require quick appointment of a referee, whose job it is to issue a decision. The entire thrust of the provision, and its ultimate mandate is to have a referee issue an award. Furthermore, the provision is designed so that if differences among the parties or members of the NRAB preclude designation of a neutral by agreement, the NMB must appoint a neutral when requested to do so and it must make such appointment quickly. Thus, differences of opinion about the identity of the neutral and objections to particular neutrals are not to bar designation of a neutral so that an award can be issued. BMWED submits that removal of cases from a neutral referee after he or she has been appointed in order that the cases may be heard by another neutral is fundamentally at odds with Section 3 First(l). Removal of cases from an appointed referee is also fundamentally at odds with the mandate of Section 3 First(l) for the referee to make an award when the partisan members of the NRAB have deadlocked because the reason for the appointment and the mandate to the referee for is for the referee to render a final and binding award.

This reading of the statute is not only required by its plain language, it is fully consistent with

---

[1] Section 3 First (l) provides:
Upon failure of any division to agree upon an award because of a deadlock or inability to secure a majority vote of the division members, as provided in a paragraph (n) of this section, then such division shall forthwith agree upon and select a neutral person, to be known as "referee", to sit with the division as a member there of, and make an award. Should the division fail to agree upon and select a referee within ten days of the date of the deadlock or inability to secure a majority vote, then the division, or any other member thereof, or the parties or either party to the dispute may certify that fact to the Mediation Board, which Board shall, within ten days from the date of receiving such certificate, select and name the referee to sit with the division as a member thereof and make an award. The Mediation Board shall be bound by the same provisions in the appointment of these neutral referees as are provided elsewhere in this chapter for the appointment of arbitrators and shall fix and pay the compensation of such referees.

the history and purpose of Section 3 First. As the Supreme Court observed in *Brotherhood of RR. Trainmen v. Chicago River & Indiana RR, supra.* 353 U.S. at 35-40, Section 3 First was added to the Act in 1934 because of the failure of the 1926 Act to provide a meaningful mechanism for resolution of contract interpretation disputes. While the original statute provided for referral of cases to equally balanced boards of adjustment with voluntary use of neutral members to hear and decide cases, arbitration was not mandatory and cases were often unresolved due to deadlock by the partisan board members. *Id.* at 35-38 The Court referred to the House report on the 1934 amendments which noted that thousand of disputes had been considered but not resolved by purely partisan member adjustment boards which were "unable to reach a majority decision, and so the proceedings have been deadlocked"; the Court noted that the report stated that because there were so many "unadjusted disputes" as a result of deadlocks and the absence of a provision for mandatory binding arbitration, unions resorted to strikes and threats of strikes to resolve disputes. *Id.* at 36. The Court then observed that the "means chosen to correct this situation are the present provisions of §3 First", which created the NRAB, and provision for appointment of neutral referees "[i]n case of deadlock on the Adjustment Board"...Thus was the machinery built for the disposition of minor grievances." *Id* at 36-37. The Court then noted that the major rail unions had agreed to this amendment, and specifically that they agreed that they would no longer strike over such disputes in return for a statutorily mandated compulsory arbitration system with the certainty that the disputes would be decided with awards rendered by the NRAB, even when its members deadlocked. *Id* at 37-39. It was based on this history and purpose of the 1934 amendments to the RLA that the Court inferred a prohibition against strikes over minor disputes-because provision of a mandatory arbitration arrangement guaranteed to result in binding awards was a substitute for, and necessarily excluded, use of self-help to resolve those disputes. *Id* at 39-41.

The Court referred to the same history and purpose of the 1934 amendments in *Union Pacific R.R. Co. v. Price*, 360 U.S. 601 (1959), in holding that submission of an employee's claim to the NRAB precluded a State court action on the claim. The Court again noted that rail labor had advocated the amendments to obtain a mandatory arbitration system with a permanent national adjustment board, so that  "both carriers and employees would be compelled to participate, that would permit an employee to compel a carrier to submit a grievance to the Board, that would provide for a neutral person to break deadlocks occurring when the labor and management representatives divided equally, and finally, that would make awards binding on the parties and enforceable in the courts, when favorable to the employees".  *Id.* at 611, footnote omitted. The Court then noted the various provisions of Section 3 First that effectuated this arrangement including the appointment of "a neutral referee to sit with the division as a member thereof and make an award, §3 First(l)". *Id*. at 612. *See also Kent v. Fugere*, 438 F. Supp 560, 562 (D. Conn. 1977)–since the original adjustment boards "did not provide for any means of breaking the frequent deadlocks, minor disputes often went unresolved. As a result, in 1934 the Act was amended to create the National Railroad Adjustment Board with the power to make final awards, with the help of neutral referees appointed by the National Mediation Board when that procedure was found necessary".  *See also* House Report on the 1934 amendments: Hearings before House of Representatives Committee on Interstate and Foreign Commerce on HR 7650 HR Rep. No 1944, 73d Cong 2d Sess at 3, 47, 58, 60.

BMWED submits that, given the plain and mandatory language of Section 3 First (l), and the precedent discussed above, it is clear that Section 3 First(l) requires both appointment of a neutral arbitrator and issuance of an award when the carrier and union members of the NRAB deadlock. Indeed, the entire purpose of the 1934 amendments was to assure issuance of awards by neutral referees so that disputes would actually be resolved and the grievance/adjustment process would be

meaningful, unlike the process that had existed initially, when the absence of neutrals to render awards meant constant deadlocks and unresolved disputes. It was the guarantee of mandatory arbitration before a neutral that would provide a final and binding decision that was the basis for the unions' relinquishment of the right to strike in minor disputes. To construe Section 3 First (l) as not requiring issuance of an award by a referee after one is appointed following deadlock of the NRAB is to ignore the mandatory language of the provision (within ten days of notice of failure of agreement on a referee the NMB "shall... select and name the referee to sit with the division as a member thereof and make an award"); and is to ignore the point of the appointment--to make an award. A reading of Section 3 First (l) that would ignore the mandate that a neutral make an award and the reason for appointment of a neutral is contrary to that provision. To allow a party to prevent the making of an award by removing cases from the neutral after he/she has been appointed negates operation of this provision and defeats its purpose. It is unimaginable that after the 1934 amendments were enacted, anyone would have accepted the notion that a party could remove a case from a neutral once one was appointed to make an award. Rail labor surely would not have agreed to forego the right to strike if Section 3 First did not require the making of a final and binding award by the neutral once appointed, and would permit a carrier to remove a case from the neutral after appointment. To allow any party to frustrate the making of an award by a neutral by removing the case from the neutral after he/she is appointed plainly inconsistent with the language and intent of Section 3 First (l) and is in violation of the Act.

BMWED further submits that removal of cases from a neutral following his/her appointment is especially egregious when, as is the case here, the cases are removed after the neutral has begun handling the case and has issued rulings. The integrity of the provision and the process would be undermined if a party that dislikes a preliminary ruling or otherwise perceives that things are not

11

going its way could then remove the case from the neutral. Indeed an effort to that sort of thing was soundly rejected by the Seventh Circuit in *Delaware & Hudson RR. Corp. v. Williams*, 129 F. 2d 11 (7th Cir. 1942). In that case, a neutral referee had been appointed to render awards on a number of claims that had been deadlocked at the NRAB. Hearings were held and the referee took the cases under advisement. After getting the impression that the referee was leaning against them, the employees withdrew their claims, apparently planning to resubmit them, "with the thought that the next time the referee appointed upon the deadlock would be favorable to them. At any rate, [they thought] they couldn't lose by withdrawal and another try". *Id*. at 16. The Court of Appeals asked: "Was this the sort of inconstancy and obstructionist tactics permissible under this statute ostensibly enacted for expeditious settlement of disputes? Should we construe the Act as giving to one party a veto over the Board's appointment of the Referee? And worse still, may the party withhold exercise of its veto until it learns how it will fare with said referee?" The Court answered: "To give such a construction to the Act, and to the relief which its enforcement demands, is to nullify and defeat the plain purpose of the Act. It is to give effect to efforts which are lacking in good faith, good sportsmanship and good conscience". The Court further observed that:

> In a somewhat similar case before this court, where the position of the parties was reversed, this court said
>> 'Equally well settled is the rule that one arbitrator or a minority of arbitrators cannot, after the dispute has been fully submitted to the Board, defeat an award by resigning, withdrawing or otherwise refusing to participate in the hearings. * * * Such a resignation or withdrawal shortly before the time fixed for the expiration of the arbitration constitutes a fraud and as such defeats its purpose'. Atchison, T. & S.F.R. Co. v. Brotherhood, 7 Cir. 26 F 2d 413, 417. See also the decision in Pittsburgh Union Stockyards Co. 309 Pa 314, 163 A 668
> We can see but one answer- a dispute once submitted and heard, may not be withdrawn and resubmitted for another try.

129 F 2d at 16.[2]

In the instant case, Arbitrator Cohen was appointed in August of 2005. Although CSXT and the carrier members of the Third Division said that he should hold onto the cases until other cases were heard, they did not object to his appointment or to his deciding the cases (indeed they expressed "delight" at his appointment); they did not seek to remove the cases in the Winter or Sprig of 2006. It was only after Mr. Cohen ruled that he had authority to proceed with the cases and then rejected CSXT's recusal request that CSXT sought to remove the cases from him. While, these cases may not have progressed to the point of a hearing on the merits, Mr. Cohen had rendered rulings that CSXT did not like. Withdrawal of cases from a referee after adverse procedural rulings is as objectionable and as destructive to a meaningful process as was the withdrawal of cases after a hearing but prior to a ruling on the merits in *Delaware & Hudson.*

BMWED submits that the language of Section 3 First(l), its history and purpose and precedent concerning that provision all demonstrate that it is a violation of that provision to remove cases from a neutral appointed to make an award before the neutral can issue an award; and it is especially troubling when this is done after the neutral has begun to issue rulings in the case. BMWED's complaint therefore states a claim for enforcement of the RLA for which the Court can grant relief.

**2. Section 3 Second Does Not Authorize A Party To Remove Cases From A Neutral Appointed To Make An Award Under Section 3 First (l) Before The Neutral Can Make An Award**

In its motion to dismiss, CSXT does not challenge BMWED's assertion that Section 3 First

---

[2] The Seventh Circuit noted a question as to whether the district court could compel the NRAB to proceed to issue the awards since the employees argued that such an order seemed like a mandamus to the NRAB; the Court of Appeals then decided to refer that question to the Supreme Court. The Supreme Court subsequently granted the petition and held "the judgment is vacated without consideration of the merits" because of "the death of the referee appointed by the National Mediation Board". 317 U.S. 600.

(l) is a mandatory requirement for appointment of a neutral to break a deadlock at the NRAB, and for the appointed referee to make an award. CSXT's defense, and the sole basis for its motion to dismiss, is its claim that it could not be in violation of Section 3 First (l) because its actions were supposedly permitted by Section 3 Second. But the language of Section 3 Second does not provide that a party may remove from a neutral cases that have already been assigned to that referee for the making of an award. Moreover, such an interpretation of Section 3 Second is inconsistent with its history and purpose.

RLA Section 3 Second provides that after a claim has been pending at the NRAB for more than twelve months, the carrier or union may refer the claim to a special board (referred to as a Public Law Board "PLB") as an alternative to waiting for resolution at the NRAB. According to CSXT, because the claims assigned to Arbitrator Cohen had been pending for more than one year, it had an absolute right to seek establishment of a PLB to hear these claims. But nothing in Section 3 Second states or suggests that this device may be utilized once the NRAB has declared deadlock and the NMB has appointed an arbitrator to break the deadlock and make an award. It is one thing for this device to be used when a case has languished at the NRAB without any action, without even a vote by the NRAB-that is the situation for which Section 3 Second was plainly designed, but CSXT used this mechanism on cases that already had an arbitrator assigned, where the arbitrator had already made some rulings and a hearing was scheduled about one week after CSXT acted to remove the cases from that arbitrator.

CSXT purports to find support for its removal of the cases from Mr. Cohen in the fact that Section 3 Second refers to cases pending for over twelve months generally, without any exceptions. According to CSXT, since the cases for which Mr. Cohen was to make an award had been pending at the NRAB for over a year, Section 3 Second permitted CSXT to remove the cases from him and

to place them before a yet-to-be established Public Law Board. CSXT Brief at 10. But again, nothing in the language of the provision supports its application in that manner. There is no reason to infer that the reference to cases pending for more than twelve months refers to anything other than cases that where there has been no action, cases that are simply sitting at the NRAB. There certainly is no basis to infer that this provision applies to cases that have already deadlocked, where a neutral and been assigned and a hearing is imminent.

BMWED submits that any doubt about the proper interpretation of Section 3 Second in this context is readily resolved by reference to the history and purpose of that provision. The reason that Section 3 Second was added to the Act was to permit the parties to move cases along when they are stagnant at the NRAB. In the decades after the 1934 amendments to the Act there developed a significant backlog in the handling of cases at the NRAB; to the dissatisfaction of the rail unions, the carriers and the government. Section 3 Second was seen as a way for one or both parties to extricate cases that had been pending for more than twelve months and to expedite arbitration of those cases. Thus, the Tenth Circuit has observed that "The Public Law Board serves as an expeditious alternative forum to the National Railroad Adjustment Board". *Watt v Union Pacific R.R. Co.*, 796 F. 2d 1240, 1242 (10th Cir. 1986). And in *International Brotherhood of Electrical Workers v CSX Transportation,* 446 F. 3d 714, 720 (7th Cir. 2006), the Seventh Circuit said that "...the point of the 1966 amendments was to expedite arbitration....".

The purpose of the 1966 amendments and the meaning of Section 3 Second is made quite clear by reference to the legislative history of that provision. At the House committee hearings on the 1966 amendments, Chairman Staggers stated:

> Currently there are long delays in the settlement of disputes arising out of grievances on the interpretation or application of collective bargaining agreements primarily on the first and  third division of the National Railway Adjustment Board.
> We are hearing today from our colleague, Mr. Williams, and from representatives of

the Railroad Brotherhoods concerning the need for establishment of some mechanism for eliminating these delays.

Hearings Before the Subcommittee on Transportation and Aeronautics, Committee on Interstate and

Foreign Commerce, on H.R. 701, 704 and 706 ((89th Cong 1st Sess. June 8, 9,and 15) at 1.

Representative John B. Williams, author of the bills, then testified that

> The problem to which these bills are directed involves the long delays in the settlement of individual grievances arising in the railroad industry involving working conditions and alleged violations of collective bargaining agreements....At the current rate of productivity it would take about 7 ½ years for all of the cases on the docket of the First Division to be disposed of; it would take a little over 1 year to dispose of all the cases on the dockets of the Second Division; about 3 ½ years to dispose of the docket of the Third Division; and about 5 months to dispose of the cases on the docket of the Fourth Division....
> *   *   *   *
> I offer this legislation as the only solution to this problem.

*Id.* at 4-5. Similarly, in the Senate hearings, Chairman Morse stated that "The principal purpose of

this bill is to eliminate the large backlog of undecided claims of railroad employees pending before

the National Railway Adjustment Board. Further it provides equal opportunity for limited judicial

review of awards of employers and employees".  Hearings before the Senate Subcommittee on Labor

of the Committee on Labor and Public Welfare (89th Cong 2d Sess. March 11, 1966 ) at 8; *see also*

the statement of the Subcommittee's counsel to the same effect regarding the purpose of the bill. *Id.*

BMWED submits that, independent of the requirements of Section First (l), CSXT's

interpretation of Section 3 Second as authorizing removal of cases from the NRAB after a referee

has been appointed to make an award should be rejected because that extraordinary proposition not

only lacks support in the plain language of the provision, it is clearly inconsistent with its history and

purpose.

It is, of course, a well-accepted principal that a statute should be construed in a manner

consistent with the purpose for which it was enacted. In *Public Citizen v. U.S. Dept. of Justice,* 491

U.S. 440, 452-453 (1989), the Court said that a statute must be interpreted and applied in accordance

with Congress' intent as shown by its legislative history. Thus, the Court stated:

> There is no doubt that the Executive makes use of the ABA Committee, and thus "utilizes" it in one common sense of the term. As the District Court recognized, however, "reliance on the plain language of FACA alone is not entirely satisfactory." 691 F.Supp., at 488. "Utilize" is a woolly verb, its contours left undefined by the statute itself. Read unqualifiedly, it would extend FACA's requirements to any group of two or more persons, or at least any formal organization, from which the President or an Executive agency seeks advice. We are convinced that Congress did not intend that result. A nodding acquaintance with FACA's purposes, as manifested by its legislative history and as recited in § 2 of the Act, reveals that it cannot have been Congress' intention, for example, to require the filing of a charter, the presence of a controlling federal official, and detailed minutes any time the President seeks the views of the National Association for the Advancement of Colored People (NAACP) before nominating Commissioners to the Equal Employment Opportunity Commission, or asks the leaders of an American Legion Post he is visiting for the organization's opinion on some aspect of military policy.

Similarly, in *Dolan v. U.S. Postal Service,* ___ U.S. ___,126 S.Ct. 1252, 1257 (2006), the Court stated that "Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis. Here, we conclude both context and precedent require a narrower reading, so that "negligent transmission" does not go beyond negligence causing mail to be lost or to arrive late, in damaged condition, or at the wrong address".

The history of judicial interpretation and application of the RLA provides direct support for reading Section 3 Second in accordance with its history and purpose. The Supreme Court has repeatedly looked to the legislative history and expressed purposes of the RLA when interpreting its provisions. The Supreme Court inferred a prohibition against strikes over minor disputes despite a lack of an express statutory bar based on the purpose of the 1934 amendments. *Chicago River, supra.,* 353 U.S. at 35-39. The Court also inferred an enforceable duty to bargain in good faith in Section 2 First based on the legislative history of that provision regarding its purpose, *Chicago & North Western Ry Co., supra.* 402 U.S. at 576-578. And the Court has limited the scope of the RLA Section 2 Fourth prohibitions against carrier interference with employee choice of representation and

self-organization for representation based on the history of the Act. *Trans World Airlines, supra.,* 489 U.S. at 440-442.

BMWED submits that it is clear that the purpose of Section 3 Second was to provide an alternative arbitral forum for carriers and unions when they did not want to wait for extended periods of time for an award from the NRAB, when the NRAB was taking no action that would lead to an actual decision. Here CSXT is not seeking to expedite a decision on stagnant cases, but rather is removing to a PLB cases for which an arbitrator was already assigned, when the arbitrator had already made some rulings and had scheduled a hearing for the purpose of issuing a decision. Furthermore, CSXT's action is actually contrary to the purpose of Section 3 Second. Rather than expediting resolution of these cases, CSXT is delaying their handling. These cases were scheduled to be heard by Mr. Cohan a mere nine days after CSXT attempted to oust him. CSXT began a process that requires creation of a new PLB, establishment of rules for that PLB and then another appointment neutral; moreover CSXT has attempted to join these cases with dozens of other cases. Whereas it is likely that Mr. Cohen would have rendered a decision by now, or reasonably soon, CSXT has actually delayed their resolution and would further delay by moving them back to the point of NRAB deadlock. This result is certainly contrary to the purpose of Section 3 Second; and for that reason alone, CSXT's interpretation of that provision should be rejected.

CSXT;s only argument in support of its position is the provision's reference to cases generally pending at the NRAB for more than twelve months, without any restriction. According to CSXT, these cases are still pending in that they have not yet been decided, and pending ought to be given its ordinary dictionary definition of "not decided" or "begun but not completed". CSXT Brief at 9-10.  However, as BMWED has shown, application of a dictionary definition in this situation is not supported by the Act, is at odds with the history and purpose of Section 3 Second, and would

lead to a result at odds with the purpose of that provision.

It has often been held that dictionary definitions may be helpful but should not be controlling when they do not make sense in the context if the statute and are at odds with its purpose. In *Booth v. C.O. Churner*, 532 U.S. 731, 731-732 (2001), the Court rejected reliance on dictionary definitions when they were at odds with the context and purpose of the statute. Thus, the Court stated: .

> Neither the practical considerations urged by the parties nor their reliance on the dictionary meanings of the words "remedies" and "available" are conclusive in seeking congressional intent. Clearer clues are found in two considerations. First, the broader statutory context in which Congress referred to "available" "remedies" indicates that exhaustion is required regardless of the relief offered through administrative procedures. While the modifier "available" requires the possibility of some relief for the action complained of, the word "exhausted" has a decidedly procedural emphasis. It makes no sense, for instance, to demand that someone exhaust "such administrative [redress]" as is available; one "exhausts" processes, not forms of relief, and the statute provides that one must. Second, statutory history confirms the suggestion that Congress meant to require procedural exhaustion regardless of the fit between a prisoner's prayer for relief and the administrative remedies possible.

*See also Public Citizen, supra*, –"Where the literal reading of a statutory term would 'compel an odd result' ...we must search for other evidence of congressional intent to lend the term its proper scope....' The circumstances of the enactment of particular legislation' for example, 'may persuade a court that Congress did not intend words of common meaning to have their literal effect. 491 U.S. at 454, citations omitted. And in *Cabell v. Markham*, 148 F. 2d 737, 739 (2d Cir. 1945), Judge Learned Hand commented, "...it is one of the one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary". In affirming that decision, the Supreme Court noted that  "...the court below refused 'to make a fortress out of the dictionary' and to read §9(e) strictly and literally. The policy as well as the letter of the law is a guide to decision. Resort to the policy of a law may be had to ameliorate its seeming harshness or to qualify its apparent absolutes as *Holy Trinity Church v. United States*, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226, illustrates. The process of interpretation also misses its high function if a strict reading of a law

results in the emasculation or deletion of a provision which a less literal reading would preserve."

*Markham v. Cabell*, 326 U.S. 404, 409 (1945).

BMWED respectfully submits that the instant case is one where the Court cannot simply apply a dictionary definition to construe the provision in question because here the consequence of doing so would be to apply the statute in a manner that has no support in the overall context of its enactment, and it would lead to a result inconsistent with the purpose of the provision. BMWED therefore submits that Section 3 Second should not be interpreted to allow CSXT to remove cases from the NRAB after a neutral was appointed to make an award and was poised to hold a hearing, in order for CSXT to put those same cases before a different arbitrator as part of a yet-to be created PLB that would hear the cases some time in the future.[3]

**3.Even If Section 3 Second Could Be Read As Advocated By CSXT It, Should Not Be Interpreted In That Manner Because To Do So Would Put That Provision In Conflict With Section 3 First(l)**

---

[3] CSXT also attempted to support its motion by relying on an arbitration award that held that it was permissible for a party to remove cases from the NRAB after an arbitrator had been appointed to decide those cases. Brief at 11-13. However, as CSXT observed (*id*. at 13 n. 9), arbitrators do not have authority to interpret the RLA, and their decisions addressing questions of law have no real force. BMWED also notes that the award does not say whether any party to that case presented the sort of argument under Section 3 First(l) that is the basis for BMWED's claims here, and the arbitration panel did not even discuss the language of Section 3 First (l). Award at 13-18. Additionally, the arbitration panel expressly relied on the fact that no rulings had been made yet by the neutral assigned to sit with the NRAB. The Arbitrator noted that none of the cases had actually been submitted to the referees, that they had not received briefs or heard arguments and that "The Referees in question have no knowledge of the procedural or substantive issues involved in the four dockets. In short the cases are in exactly the same posture as any 'inactive' cases not assigned to a referee. On this record there is no valid basis for the Procedural Neutral to find that any party is being unfairly advantaged or disadvantaged by the removal of the cases from the First Division for submission to this public law board" Award at 17. Thus, the situation in the case relied on by CSXT was not one where a party sought to remove a case from a neutral after he issued rulings adverse to that party-the situation presented here. Accordingly, BMWED submits that the arbitration award cited by CSXT provides no support for CSXT's position; if anything, the award at least supports BMWED's argument that a case certainly may not be removed from a neutral appointed to sit with the NRAB once the neutral begins handling the case.

Even if it is concluded that Section 3 Second standing alone could be interpreted to permit CSXT to remove cases from the NRAB after they were assigned to a neutral appointed to make an award, the provision should not be interpreted in that manner because that would put Section 3 Second in conflict with Section 3 First(l).

It is well-established that multiple provisions of a statute should be interpreted in a manner that is internally consistent and gives effect to its various provisions; interpretations of specific provisions that would be contrary to the overall purposes of the statute, or negate or hinder other provisions, should be rejected. In *Gustafson v. Alloyd Co. Inc.*, 513 U.S. 561, 570 (1995), the Supreme Court stated **"The 1933 Act, like every Act of Congress, should not be read as a series of unrelated and isolated provisions"**. There the Court rejected an otherwise defensible interpretation of a provision in favor of a reading that would be consistent with other provisions of the statute and with the intent of Congress as expressed in the legislative history of the Act. In *Gonzales v. Oregon*, ___ U.S.___, 126 S.Ct. 904, 924 (2006), the Court stated that "On its own, this understanding of medicine's boundaries is at least reasonable. The primary problem with the Government's argument, however, is its assumption that the CSA impliedly authorizes an Executive officer to bar a use simply because it may be inconsistent with one reasonable understanding of medical practice. Viewed alone, the prescription requirement may support such an understanding, but statutes 'should not be read as a series of unrelated and isolated provisions.' *Gustafson v. Alloyd Co.,* 513 U.S. 561, 570 (1995). The CSA's substantive provisions and their arrangement undermine this assertion of an expansive federal authority to regulate medicine". *See also K mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291 (1988)–"[i]n ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole"; and *Household Credit Services, Inc., v. Pfennig*, 541 U.S. 232, 239-240 (2004), reversing an

appellate decision which construed a provision of a statute without examining and giving appropriate weight to other provisions of the statute.

In the instant case, BMWED has demonstrated that Section 3 First(l) mandates appointment of a neutral referee to make an award when the NRAB deadlocks, that the ultimate point of the provision is for the referee selected to render an award, and that the purpose of that provision was to remedy a defect in the Act whereby cases would go undecided due to absence of a referee to make an award. BMWED has further demonstrated that to allow a party to remove cases from a referee after he/she was appointed would negate the mandate of Section 3 First by allowing a party to prevent an appointed neutral to break the deadlock and make an award. Additionally, as the Court in *Delaware & Hudson, supra*. observed, allowing a party to remove cases from an arbitrator appointed to sit with the NRAB to make an award in order to submit the cases to another arbitrator is fundamentally inconsistent with the scheme of Section 3 First and would undermine the integrity of the Section 3 processes. BMWED therefore submits that even if Section 3 Second could be construed as CSXT advocates, that reading should be rejected because it would undercut Section 3 First, and would be inconsistent with the overall statutory scheme. By contrast, an interpretation of Section 3 Second under which only cases pending at the NRAB for more than twelve months which did not have a referee assigned can be removed to a PLB is consistent with the language of that provision, consistent with the history and purpose of Section 3 Second, prevents an illogical application of the statute and permits the Act to operate in an internally consistent manner that effectuates its overall purpose.

BMWED further submits that it does not matter that Section 3(l) First does not mention Section 3 Second because Section 3 First(l) was enacted prior to Section 3 Second. Nor does it matter that Section 3 Second does not except cases where an arbitrator has already been assigned

under Section 3 First(l). Section 3 Second was enacted for a specific purpose not inconsistent with

Section 3 First(l). Indeed it was directed at cases that had not yet reached the 3 First(l) stage in the

process–deadlock on the claim by the members of the NRAB-- but were effectively stuck at a prior

level with no ability a party desiring to do so to move the cases to arbitration. There is no reason to

assume that by failing to except cases that had been pending for twelve months but had actually been

referred to a referee, Congress intended to allow parties to negate Section 3 First(l) by removing

from arbitration cases that already had an arbitrator assigned.[4]

Given the foregoing, BMWED has shown that its claim under Section 3 First (l) is one for

which the Court can grant relief so CSXT's motion for dismissal of that claim should be denied.

## B. BMWED'S COMPLAINT STATES A VALID CLAIM FOR RELIEF IN ASSERTING THAT CSXT'S REMOVAL OF THE CASES FROM ARBITRATOR COHEN VIOLATED RLA SECTION 2 FIRST

RLA Section 2 First provides:  "It shall be the duty of all carriers, their officers, agents, and

employees to exert every reasonable effort to make and maintain agreements concerning rates of pay,

rules, and working conditions, and to settle all disputes, whether arising out of the application of

such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of

any carrier growing out of any dispute between the carrier and the employees thereof."  BMWED

contends that this claim is one for which the Court could grant relief under Section 2 First because,

by defeating the ability of the neutral appointed by the NMB to decide the cases assigned to him, and

---

[4] CSXT contends that it is somehow significant that BMWED previously entered an agreement with CSXT for establishment of PLBs to hear certain other cases that had been pending before the NRAB for more than twelve months, and that BMWED should not now be heard to complain when CSXT acted to do the same thing. CSXT Brief at 17 n.12. But what BMWED once acquiesced to by agreement says nothing about its right to react to something CSXT did unilaterally, or about BMWED' ability to enforce its statutory rights when CSXT acts without BMWED's agreement. Additionally, the cases where both parties agreed to refer pending cases to PLBs were not ones where neutrals had already been assigned and had rendered rulings.

by substantially delaying resolution of the those cases which were ready to be heard nine days after CSXT removed them from the neutral, CSXT failed and refused to exert every reasonable effort to settle those disputes in violation of Section 2 First. And contrary to the suggestion of CSXT, acceptance of BMWED's cause of action would not involve the court in assessing the relative efficiency of different methods of arbitrating disputes. The decision in this case will not turn on whether the Court believes one method of arbitration is better, more efficient or faster than the other, in general or in particular. Rather the court is asked to enforce the Act, to decide whether CSXT's actions in responding to the appointment of Arbitrator Cohen, culminating in its withdrawal of the cases from Arbitrator Cohen on the cusp of a hearing, complied with CSXT's duty to exert every reasonable effort to settle the disputes as required by Section 2 First.

CSXT advances two arguments in support of its motion for dismissal of BMWED's Section 2 First claim: that its action was permitted by Section 3 Second, and that Section 2 First does not apply to minor disputes. CSXT Brief at 13-17. Neither argument has any merit.

As BMWED has shown, Section 3 Second cannot be read as affirmatively permitting a party to remove a case from a neutral assigned to decide those cases under Section 3 First(l) because such an interpretation of Section 3 Second would allow parties to negate Section 3 First(l). For the same reasons Section 3 Second should not be read to defeat operation of Section 2 First which states a set of overarching RLA duties, and which has been described as the heart of the Act. *Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 377-378 (1969). Again, nothing in the language of Section 2 Second supports such a reading of that provision, and it should not be interpreted to negate application of Section 2 First in this case.

CSXT's argument that Section 2 First is inapplicable in minor dispute cases is also without merit. Nothing in the language of that provision states or suggests that it is inapplicable to minor

disputes. In fact, by its terms, carriers and their employees are directed to "settle all disputes, whether arising out of the application of such agreements or otherwise"-this language clearly covers minor disputes.

Additionally precedent under Section 2 First holds that it imposes broad duties applicable to various interactions between carriers and their employees.  In *Chicago & North Western Transp. Co. v. UTU*, *supra.*, the Supreme Court described the duties imposed by Section 2 First as overarching and in addition to other duties imposed in other parts of the Act. The Court noted that Donald Richberg, the representative of the unions in the negotiations that led to the RLA, testified that the parties did not write specific commands and prohibitions into the law, and that the Statute was designed so that courts would develop a common law of Section 2 First based on the general language that was applicable to both parties. 402 U.S. at 576-577. The Court then concluded that the mandate of Section 2 First is "more than a mere statement of policy or exhortation to the parties, rather, it was designed to be a legal obligation, enforceable by whatever appropriate means might be developed on a case-by-case basis". *Id.* at 577. The holdings in *CNW v UTU* that the broad language used in Section 2 First imposed broad duties, and that the statute was designed for development of a common law filling in the range of duties imposed by this provision refute the notion that Section 2 First is inapplicable in minor disputes. Additionally, various appellate courts have  have identified a number of Section 2 First obligations that are not based in any specific command of that provision. In *International Ass'n of Machinists and Aerospace Workers v. Transportes Aeros Mercantiles Pan Americandos*, 924 F. 2d 1005, 1007, 1009-1010 (11th Cir. 1991)*,* the Eleventh Circuit held that Section 2 First contains an implicit prohibition against unilateral changes in rates of pay, rules and working conditions by a carrier once bargaining begins, even though no such duty is specifically identified in Section 2 First and even when there is no

agreement already in place. 924 F. 2d at 1008, 1010-1011. In *Association of Flight Attendants v. Horizon Air Industries, Inc.,* 976 F. 2d 541 (9th Cir. 1992), the Ninth Circuit held that a company had violated Section 2 First by effectively refusing to bargain with the union, although Section 2 First does not have an express command for good faith bargaining. And in *Delta Air Lines, Inc. v. Air Line Pilots Ass'n. Int'l.*, 238 F. 3d 1300, 1304 (2001), the Eleventh Circuit found that a union violated Section 2 First when individual air line pilots declined to work overtime while the parties were engaged in bargaining on proposed changes to their agreement. The Court inferred into Section 2 First an affirmative duty for the union to prevent such concerted action because the union was required to make "every reasonable effort", "to do everything possible to maintain the CBA so that commerce is not in any way interrupted". 238 F.3d at 1309. Moreover, the Court specifically rejected the union's argument that there was no RLA violation because the agreement described overtime as voluntary for individual pilots. And the Court rejected the union's claim that, at a minimum, the overtime provision in the contract rendered the case a minor dispute because the parties' agreement at least "arguably" allowed pilots to refuse overtime. The Court held that regardless of the union's contractual defense, the carrier had a claim under Section 2 First, a provision "at the heart of the RLA. and one that is "within the province of the federal courts to enforce". *Id.* at 1307-1308. BMWED submits that these decisions reject CSXT's narrow reading of Section 2 First.

CSXT argues that the Supreme Court's decision in *Consolidated Rail Corp. v. RLEA,* 491 U.S. 299 (1989), said that Section 2 First does not apply to minor disputes. CSXT Brief at 15, *citing Conrail,* 491 U.S. at 305 n.[5]. However, the *Conrail* case did not even involve a claim under Section 2 First. That case concerned the manner of distinguishing between major disputes (under RLA Section 2 Seventh) and minor disputes (under RLA Section 3), and whether a dispute over

unilaterally implemented drug tests was major or minor. A subsidiary argument offered by the unions was that even if the dispute was minor, the carrier could be required to maintain the status quo pending arbitration. The Court noted that the unions had asserted that Section 2 First could impose a status quo obligation in minor disputes, citing a passage in *Detroit Toledo and Shore Line R.R. v UTU*, 396 U.S. 142, 151 (1969) that referred to an implicit status quo requirement imposed by the Section 2 First duty to exert every reasonable effort to settle all disputes. The Court rejected that argument, noting that the cited passage in *Shore Line* referred to Section 2 First in discussing the status quo requirement in major disputes. 491 U.S. at 305 n.5 . Thus, the Court made no pronouncement that Section 2 First is inapplicable in minor disputes, rather it only said that there is no general status quo requirement in minor disputes, and none could be inferred from Section 2 First. However, BMWED notes that the Court also related the requirement for arbitration of contract interpretation disputes to Section 2 First, stating that requiring arbitration of such disputes was consistent with the Section 2 First mandate that parties make every reasonable effort to settle all disputes and maintain agreements. *Id.* at 310.

BMWED further submits that the two appellate decisions cited by CSXT (CSXT Brief at 15-16) do not support the conclusion that there is no Section 2 First cause of action in the instant case. Those decisions rejected application of Section 2 First in specific situations where the courts concluded that the carriers' conduct was permitted by some other section of the RLA and/or that application of Section 2 First in those situations would undermine the collective bargaining process and quid pro quos exchanged in the parties' agreements.

*Brotherhood of Maintenance of Way Employes v. Union Pacific R.R.*, 358 F. 3d 453 (7th Cir. 2004), concerned a dispute over how to arbitrate another dispute over interpretation of a settlement agreement. The union sought an expedited arbitration of the general issues between the parties before

a Special Board of Adjustment, but the carrier insisted on handling claims of individual employees through the contractual grievance procedure and the claims arbitration process. *Id*. at 456. The Seventh Circuit rejected BMWED's argument that the carrier's position violated Section 2 First because the parties had an agreement on how claims would be processed and the carrier was willing to handle the case in accordance with that process. The Court said that "the law requires that a party make every *reasonable* effort, not every *conceivable* one". *Id*. at 458, emphasis in original. The Court also felt that BMWED should not be able to negate the contractual process by taking claims out of that process and that the carrier should not held to violate Section 2 First when its actions were not only permitted by the agreement but were permitted by RLA Section 3, and it was moving toward arbitral settlement of the disputes. *Id*. at 458.

      *Brotherhood of Maintenance of Way Employes v. CSX Transportation*, 143 Fed Appx. 155 (11th Cir. 2005) (unreported), involved claims by BMWED that CSXT violated Section 2 First by failing to produce certain contractually required reports and by failing to produce background information used to generate the reports. The Eleventh Circuit concluded that the obligation to provide the reports and any duty provide the background information inherently involved interpretation and application of the collective bargaining agreement, so the dispute necessarily had to be arbitrated. The Court felt that providing a Section 2 First cause if action in that situation would undermine the requirement that contract interpretation disputes be arbitrated and would mean that new contract terms could also lead to new and unanticipated statutory duties which would make it difficult for the parties to define the scope of their respective rights and obligations. *Id.* at *6.

      BMWED submits that the instant case differs from these two prior cases in several respects. Here it cannot be said that BMWED is attempting to enforce a collective bargaining agreement through Section 2 First; nor can it be said that BMWED's action would add a new agreement

obligation or potentially negate an existing contract right of the carrier. Additionally, CSXT has not said and cannot say that its actions comply with some provision of the parties' agreement. It also cannot be said that CSXT has made a reasonable effort to settle the underlying disputes. By contrast, in the *Union Pacific* case the carrier agreed to process the case to arbitration but would not expedite arbitration of the issues as a sort of class action before a special adjustment board; UP even agreed to expedited arbitration of individual claims (district court decision 2003 WL 21673930 *4). In the earlier CSXT case, the carrier produced the contractually required reports shortly after the union filed suit, and it argued that the case was therefore moot (143 Fed Appx at 157-158). By contrast, here, CSXT has not made a reasonable effort, much less every reasonable effort, to obtain settlement of the claims in dispute through arbitration.

CSXT's actions in August of 2006 must be viewed in the context of its handling of the disputes since the cases deadlocked at the NRAB. CSXT and its representatives on the NRAB have done everything they could to delay arbitration of the claims at issue. Arbitrator Cohen was appointed in August of 2005, NRAB representatives pronounced themselves "delighted" with the appointment but then engaged in a series of stalling maneuvers, posing various objections to actually arbitrating the disputes so that they could be settled (as envisioned by the 1934 amendments and the *Chicago River* decision). Once funding was available and the NMB advised Mr. Cohen that he had authority to proceed with the cases, CSXT and its representatives raised the same objections they had previously raised, and which had already been rejected. When that effort failed, CSXT made a specious recusal request. After Arbitrator Cohen ruled that there was no basis for the recusal and scheduled a hearing CSXT did not proceed to a hearing. Instead, CSXT acted to take the cases away from Mr. Cohen and to place them with dozens of other cases before a PLB that had not yet been created, and before a new arbitrator who would then have to be appointed some time in the future.

After about a year of delaying settlement of the disputes through arbitration, CSXT not only engendered substantial additional delays in reaching a settlement of the disputes, it acted to remove an arbitrator who had been appointed by the NMB, who had already rendered rulings in the cases assigned to him, and who was about to hear the cases. BMWED submits that the facts it has alleged demonstrate that CSXT's conduct with respect to the arbitration of these claims is substantially different from the conduct of Union Pacific in the Seventh Circuit case and from CSXT's conduct in the Eleventh Circuit case. The facts alleged by BMWED set forth a cognizable claim of failure and refusal to exert every reasonable effort to settle the disputes. So BMWED has pleaded a claim upon which relief can be granted under Section 2 First' and CSXT's motion for dismissal of this aspect of BMWED's complaint should therefore be dismissed.

## CONCLUSION

For all of the foregoing reasons, BMWED respectfully submits that CSXT's motion for dismissal of BMWED's complaint against CSXT should be denied.

Respectfully submitted,

_____/s/_____
Richard S. Edelman
Of Counsel:                          D.C. Bar No. 416348
William A. Bon, Esq.                 O'Donnell, Schwartz & Anderson, P.C.
General Counsel                      1900 L Street, N.W., #800
Brotherhood of Maintenance           Washington, DC 20036
of Way Employes                      (202) 898-1824
20300 Civic Center Dr. Suite 320     fax (202)-429-8928
Southfield, MI 48076-4169
(248) 948-1010


December 8, 2006

Attorneys for Plaintiffs Brotherhood of Maintenance of Way Employes Division/IBT

30