IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYES, DIVISION, IBT, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No.: 1:06-cv-01532-CKK ) |
| NATIONAL MEDIATION BOARD | ) ) |
| and | ) ) |
| CSX TRANSPORTATION, INC., | ) ) |
| Defendants. | ) ) |

_____

**REPLY IN SUPPORT OF MOTION TO DISMISS
OF DEFENDANT CSX TRANSPORTATION, INC.**

CSX Transportation, Inc. ("CSXT") contends that the Complaint of the Brotherhood of

Maintenance of Way Employes, Division of International Brotherhood of Teamsters

("BMWED") must be dismissed as to CSXT, because the CSXT actions complained of, the

withdrawal of certain cases from the National Railroad Adjustment Board ("NRAB") to a public

law board ("PLB"), were expressly authorized by Section 3, Second of the Railway Labor Act

("RLA"), 45 U.S.C. § 153, Second.  As explained in CSXT's Memorandum of Points and

Authorities in Support of Motion to Dismiss ("CSXT Mem."), that Section allows a party to

withdraw cases from the NRAB, which have been "pending before the Adjustment Board for

twelve months from the date the dispute (claim) is received by the Board."  BMWED opposes

CSXT's motion arguing that: (1) Section 3, First (l) of the RLA, 45 U.S.C. § 153, First (l),

prevents the removal of cases pending at the NRAB once a referee, i.e., a neutral arbitrator, has

been appointed; and (2) CSXT's actions in response to the appointment of Arbitrator Cohen violated Section 2, First of the RLA, 45 U.S.C. § 152, First.  As for CSXT's reliance on Section 3, Second of the RLA, BMWED argues that the word "pending" in Section 3, Second should be construed not to apply to cases once a referee has been appointed pursuant to Section 3, First (l).

Notwithstanding BMWED's extended legislative history and policy arguments, CSXT's motion still presents a straightforward question of statutory interpretation.  The language of Section 3, Second is clear and unambiguous that the only prerequisite to withdraw cases from the NRAB to a PLB is that they have been pending at the NRAB for twelve months.  BMWED's arguments that the Court should "infer" that Congress intended a different meaning of "pending" than its common meaning are without merit.  Congress was aware of Section 3, First (l) when it enacted Section 3, Second some thirty years later.  If Congress had not intended that cases could be withdrawn to a PLB once a referee had been appointed pursuant to Section 3, First (l), it could have easily said so.

Because CSXT's actions were expressly authorized by Section 3, Second, BMWED has also failed to show any violation of Section 2, First of the RLA.  For the reasons stated here and in CSXT's Memorandum, the Second and Third Causes of Action in BMWED's Complaint should be dismissed as a matter of law.

I.      Section 3, First (l) Does Not Support BMWED

BMWED contends that Section 3, First (l) of the RLA "mandates" that a referee appointed to sit with the NRAB make an award and, therefore, the withdrawal of cases by CSXT from Arbitrator Cohen violated that Section, because their withdrawal prevented him from making an award in those cases.  There is no merit to BMWED's interpretation of Section 3, First (l).  Section 3, First (l) does not "mandate" that a referee make an award.  It merely

provides for the appointment of a referee to sit with a Division of the NRAB to cast the tie-breaking vote when the partisan members of the Division have deadlocked.

BMWED spills a good deal of ink describing Section 3, First (l) and its legislative history and purpose. For the most part, BMWED's description is unremarkable. There is no question that Section 3 of the RLA was amended in 1934 to improve the workings of arbitration boards called adjustment boards. The RLA, as enacted in 1926, contemplated that carriers and unions would agree to the creation of arbitration boards to resolve disputes arising over the interpretation or application of collective bargaining agreements, i.e., so-called "minor" disputes. Even when the parties agreed to the creation of an adjustment board, Section 3 of the RLA as originally enacted was not, however, especially effective in resolving such disputes. The statute provided that the adjustment boards would have an even number of partisan members, half appointed by labor unions and half appointed by railroads, and they frequently deadlocked. See generally, e.g., Bhd. of R.R. Trainmen v. Chicago River & Ind. R.R. Co., 353 U.S. 30, 35-37 (1957) ("Chicago River"). In the 1934 amendments, Congress created the NRAB to replace such boards. The NRAB and its four Divisions are still comprised of an even number of partisan members. 45 U.S.C. § 153, First (a), (h). To avoid the deadlock problem, Congress provided a tie-breaking mechanism in Section 3, First (l). That mechanism is the appointment of a neutral member, i.e., a "referee," to sit with the Division for purposes of resolving the deadlocked cases. If the partisan members deadlock, then they could select a referee. Section 3, First (l) further provided that, if they could not agree on the selection of a referee within ten days, then either the carrier or the labor member of the Division or either party to the dispute can request the National Mediation Board ("NMB") to appoint a referee.

BMWED misdescribes Section 3, First (l) in one important respect, however.  BMWED contends that "[t]o construe Section 3 First (l) as not requiring the issuance of an award <u>by a referee</u> after one is appointed following deadlock of the NRAB is to ignore the <u>mandatory</u> language of the provision . . . ."  BMWED Memorandum in Opposition to CSXT's Motion to Dismiss Complaint at 11 (emphasis added) ("BMWED Opp."); <u>see also</u> <u>id.</u> ("A reading of Section 3, First (l) that would ignore the <u>mandate</u> that a <u>neutral</u> make an award and the reason for appointment of a neutral is contrary to that provision.") (emphasis added).  Section 3, First (l) does not, however, "mandate" that a referee issue an award.  An award is issued, if at all, by the NRAB or one of its Divisions, not a particular referee.  When Section 3, First (l) states that the referee will be appointed "to sit with the division as a member thereof, and make an award," that phrase does not refer to the referee making the award.  The referee by himself cannot make an award.  It takes a vote of two of the three members of a Division of the NRAB to make an award.  Section 3, First (n) states that "[a] majority vote of all members of the division of the Adjustment Board eligible to vote shall be competent to make an award."  So, the language in Section 3, First (l) upon which BMWED relies is referring to the division of the NRAB making an award, not the referee.

This may seem like a nuance, but BMWED is here straying from the actual language of the statute to try to construct a predicate for its argument that Section 3, First (l) mandates that a particular referee must issue an award and to manufacture a conflict between Section 3, Second and Section 3, First (l), where none exists, if the plain meaning of "pending" is given effect.  When CSXT withdrew fifty cases from the Third Division, including the ten cases for which Arbitrator Cohen had been appointed, CSXT did not withdraw cases from Arbitrator Cohen or prevent him from making an award, as BMWED alleges.  CSXT withdrew cases from the

NRAB, as Section 3, Second expressly allowed it to do so that those cases would be decided by a PLB.

BMWED's argument that Section 3, First (l) "mandates" the appointment of a neutral and decision of the dispute by the referee also proves too much. Yes, the neutral is to cast a vote along with the other members of the Division "as a member thereof, and make an award," but that is only if the case is decided by the NRAB. BMWED is wrong that Section 3, First (l) always requires that the referee, really, the Division with whom he or she is sitting, make an award once a referee has been appointed pursuant to Section 3, First (l). A Division may not make an award, that is, resolve a dispute on the merits, for any number of reasons. Those reasons include withdrawal of a claim by the party who initiated the proceedings (because that party has decided to abandon the claim); settlement of the dispute; a finding by the NRAB that it lacks jurisdiction because jurisdiction is in some other arbitration forum; or, as relevant to this case, because cases have been withdrawn from the NRAB pursuant to Section 3, Second for decision by a PLB.

BMWED sets up a straw man when it argues that "[t]o allow a party to prevent the making of an award by removing cases from the neutral after he/she has been appointed negates operation of this provision and defeats its purpose." BMWED Opp. at 11. But, removing cases pursuant to Section 3, Second does not, of course, "prevent the making of an award." The withdrawal simply means that the award will be made by a PLB instead of the NRAB.

BMWED cites several court decisions that supposedly support its contention that Section 3, First (l) mandates that a referee, once appointed, must make an award. None of these decisions support BMWED's construction of Section 3, First (l) to prevent a party from exercising its statutory right under Section 3, Second to withdraw cases from the NRAB. None

had this as an issue.  Nor could they, because <u>all</u> were decided well <u>before</u> Congress amended the

RLA in 1966 to add the language in Section 3, Second, which allows the creation of PLBs.  For

example, in the 1957 <u>Chicago River</u> decision, the Supreme Court held that unions could not

strike over minor disputes within the meaning of the RLA and the Norris LaGuardia Act did not

deprive federal district courts from enjoining such strikes.  In <u>Union Pacific R.R. Co. v. Price</u>,

360 U.S. 601 (1959), the Court held that the RLA's requirement that minor disputes be submitted

to final and binding arbitration pursuant to Section 3 of the RLA foreclosed an employee from

bringing his claim in state court.  In each case, the Court merely described the workings of

Section 3, First in deciding the issue before the Court.

The only precedent cited by BMWED where a court found that cases could not be

withdrawn from the NRAB was <u>Delaware & Hudson R.R. Co. v. Williams</u>, 129 F.2d 11 (7th Cir.

1942).  The most important thing to note about this case is that it was decided twenty-four years

before the 1966 amendments to the RLA.  So, this case provides absolutely no support to

BMWED or guidance how this case should be decided.  CSXT also notes that, in the facts of that

case, the disputes had already been heard by the NRAB and the referee had made known how he

was going to vote to the partisan members of the NRAB.  Only after he did so did the union seek

to withdraw the cases, presumably to be resubmitted to the NRAB at another time.  It is

undisputed that that was not so for any of the cases that CSXT withdrew.  The allegations in the

Complaint show that there was never a hearing before Arbitrator Cohen and that he never

considered the merits of the cases for which he had been appointed to sit with the Third Division,

let alone indicate how he might rule.

More fundamentally, Section 3, First (l) does not bar the withdrawal of cases from the

NRAB, because the later enacted Section 3, Second specifically addresses the circumstances

when cases can be unilaterally withdrawn from the NRAB by a carrier or union and placed with a PLB.

II.    Section 3, Second Is Not Limited To Cases For
        Which A Referee Has Not Yet Been Appointed

BMWED argues that the plain language of Section 3, Second does not authorize the withdrawal of cases from the NRAB to a PLB once a referee has been appointed pursuant to Section 3, First (l).  Even if it does, BMWED argues that this Court should infer a limitation on when a party can withdraw cases from the NRAB, because to give the word "pending" in Section 3, Second its plain meaning allegedly would otherwise produce absurd results not intended by Congress.  BMWED's arguments are without merit.

A statutory interpretation case "begins where all such inquiries must begin: with the language of the statute itself."  U.S. v. Ron Pair Enter., Inc., 489 U.S. 235, 241 (1989) ("Ron Pair"); see also DBI Architects, P.C. v. Am. Express Travel Related Servs. Co., Inc., No. 02-1729, 2006 WL 3405483, at *4 (D.D.C. Mar. 30, 2006).  BMWED contends that CSXT's "extraordinary proposition" that Section 3, Second authorizes "removal of cases from the NRAB after a referee has been appointed to make an award" "lacks support in the plain language of the provision . . . ."  BMWED Opp. at 16.  BMWED argues further that "the language of Section 3 Second does not provide that a party may remove from a neutral cases that have already been assigned to that referee for the making of an award."  BMWED Opp. at 14.  But, that is exactly what the plain language authorizes if those cases have been "pending" at the NRAB for twelve months or more.  The relevant language in Section 3, Second states as follows:

If written request is made upon any individual carrier by the representative of any craft or class of employees of such carrier for the establishment of a special board of adjustment to resolve disputes otherwise referable to the [NRAB], or any dispute which has been pending before the [NRAB] for twelve months from the date the dispute (claim) is received by the Board, or if any carrier makes such a request upon any such representative, the carrier or the

representative upon whom such request is made shall join in an agreement establishing such a board within thirty days from the date such request is made.

45 U.S.C. § 153, Second (emphasis added).  Section 3, Second refers broadly to "any" dispute that has been pending for twelve months or more.  It does not say "any" such dispute, except those for which a referee has been appointed pursuant to Section 3, First (l).

BMWED effectively concedes that cases for which a referee has been appointed, but which have not yet been decided, are still "pending" within the plain meaning of Section 3, Second when BMWED argues that "dictionary definitions may be helpful but should not be controlling when they do not make sense in the context of the statute and are at odds with its purpose."  BMWED Opp. at 19 (citing Booth v. C.O. Churner, 532 U.S. 731 (2001)).  BMWED argues that giving the word "pending" its plain meaning, i.e., not yet decided, would frustrate the intent and purpose of Congress behind Section 3, Second.  None of the cases involving statutory construction cited by BMWED involved the word "pending."  BMWED never addresses the several cases cited by CSXT, which all held that when Congress used the word "pending" in a statute, it intended it to have its ordinary meaning.  Contrary to BMWED's contention, giving that term its ordinary meaning in the context of Section 3, Second and Section 3, First (l) of the RLA does not produce odd or absurd results.

BMWED contends that giving plain meaning to "pending" will produce odd results, because, if a party can remove cases from the NRAB to a PLB after a referee has been appointed pursuant to Section 3, First (l), this will delay the resolution of the removed cases.  BMWED argues that this is an odd result, because "[t]he reason that Section 3 Second was added to the Act was to permit the parties to move cases along when they are stagnant at the NRAB.  In the decades after the 1934 amendments to the Act there developed a significant backlog in the handling of cases at the NRAB; to the dissatisfaction of the rail unions, the carriers and the

government." BMWED Opp. at 15. From this legislative history and purpose, BMWED concludes that Section 3, Second should not be construed to permit the withdrawal of cases from the NRAB once a referee has been appointed. BMWED presumes that the cases would then no longer stagnate at the NRAB, but would expeditiously move forward. According to BMWED, by withdrawing the cases after a referee had been appointed and shortly before a hearing scheduled by the referee, CSXT is acting contrary to the congressional purpose of Section 3, Second, because their decision will be delayed more than if they had been left at the NRAB. BMWED Opp. at 18-19.[1]

The general rule is that "Congress 'says in a statute what it means and means in a statute what it says there.'" Hartford Underwriters Ins. Co. v. Union Planters Bank, 530 U.S. 1, 6 (2000) (quoting Conn. Nat'l Bank v. Germain, 503 U.S. 249, 254 (1992)); see also, e.g., Ransom v. Babbitt, 69 F. Supp. 2d 141, 151 (D.D.C. 1999) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.") (quoting Perrin v. U.S., 444 U.S. 37, 42 (1979)). It is a "rare" case in which "the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." Ron Pair, 489 U.S. at 242. BMWED has failed to show that giving the word "pending" its "ordinary, contemporary, common meaning" presents such a rare case.

---

[1] BMWED claims that CSXT has removed cases from the NRAB "to place them before a yet-to-be established Public Law Board." BMWED Opp. at 14-15 (emphasis added). This is incorrect. In fact, the PLB requested by CSXT is established. It was established by operation of law when the BMWED designated its member on the PLB, CSXT having already designated its member at the time of its request. See Declaration of Steven V. Powers, Exh. 26 ("Powers Decl.") (attached to BMWED Opp.). Section 3, Second provides that a PLB is established when the carrier and union have each designated their member to the PLB. 45 U.S.C. § 153, Second. ("Such board shall consist of one person designated by the carrier and one person designated by the representative of the employees.").

There is no question that the backlog of cases at some divisions of the NRAB was the impetus for the 1966 amendments of the RLA. However, Congress, in authorizing the creation of PLBs, intended more than to allow a way to diminish those backlogs. Section 3, Second allows a carrier or union to request the creation of a PLB, not only as an alternative to the NRAB when cases were stuck there, but also as an alternative to the NRAB altogether. Section 3, Second allows a carrier or union to request a PLB to hear cases "otherwise referable to the [NRAB] . . . ." 45 U.S.C. § 153, Second. Over time, PLBs have become preferred over the NRAB as the arbitration forum for the resolution of contract interpretation disputes. See, e.g., BENJAMIN AARON, ET AL., THE RAILWAY LABOR ACT AT FIFTY: COLLECTIVE BARGAINING IN THE RAILROAD AND AIRLINE INDUSTRIES 229-35 (Charles Rehmus ed., 1977) (discussing the growth and popularity of public law boards).

The language that Congress chose to allow a carrier or union to withdraw cases from the NRAB cannot be said to produce absurd results. By using the phrase "any dispute which has been pending before the [NRAB] for twelve months," Congress employed simple, easily understood language to set an objective, easily applied criterion for when cases could be withdrawn to a PLB. There is nothing absurd about this criterion. Notwithstanding BMWED's contentions that, once a referee has been appointed pursuant to Section 3, First (l), cases will quickly move to decision, there is no guarantee that that will necessarily or always be so. Cases may have already been pending at the NRAB or have been deadlocked for some time before a request is even made pursuant to Section 3, First (l) for the appointment of a referee. For example, some of the cases for which Arbitrator Cohen was ultimately appointed on August 12,

2005 had already been pending at the NRAB since May 27, 2004.  See CSXT Mem., Exh. A ,

Attachment A.[2]

   In addition, just because a referee is appointed pursuant to Section 3, First (l) does not

mean that that particular arbitrator will accept the appointment.  There is no requirement in the

RLA that he or she do so.  For example, after a request to the NMB by BMWED pursuant to

Section 3, First (l), a different arbitrator, Arbitrator Suntrup, was initially selected to sit with the

NRAB to hear the cases for which Arbitrator Cohen would later be appointed.  Powers Decl.

¶ 12.  Arbitrator Suntrup subsequently declined the appointment resulting in the need to appoint

a replacement.

   While BMWED criticizes CSXT for asking Arbitrator Cohen to recuse himself, BMWED

neglects to mention that it had previously asked another arbitrator appointed by the NMB

pursuant to Section 3, First (l) to act as the referee for other BMWED-CSXT contracting out

cases to recuse himself, which he did.  Powers Decl., Exh. 17.  There was then a delay while the

NMB appointed a replacement.

   The appointment of a referee also does not guarantee that the cases will be heard soon

thereafter.  See, e.g., Order of Ry. Conductors & Brakemen & Elgin, Joliet & E. Ry. Co., PLB

No. 46, Award No. 1 at 15 (1968) (Seidenberg, Arb.) ("It must be pointed out that under the

procedures of the First Division [of the NRAB] the fact that a case has been deadlocked and

placed on a referee's list does not necessarily mean that the case will ever be heard.") (copy

---

   [2] Exhibit A is the August 14, 2006 CSXT letter requesting the establishment of a PLB.
Attachment A to that letter lists the fifty cases that CSXT withdrew from the NRAB.  A
comparison of the Docket Nos. for those cases and the Docket Numbers for the Cohen cases
listed in BMWED's Complaint (¶ 15) shows that the first ten cases on Attachment A are the cases
for which Arbitrator Cohen was appointed to sit with the Third Division.  Attachment A shows
that these cases were filed with the NRAB between May 27, 2004 and  January 20, 2005.

attached to CSXT Mem., Exh. B). Again, using the cases for which Arbitrator Cohen was appointed as an example, he was appointed on August 12, 2005. Cmplt ¶ 17. However, he did not propose hearing dates to the parties until May 19, 2006, and he finally set the hearing date for August 23, 2006, nearly a year after his appointment. Id. ¶¶ 21, 25.

And, while BMWED likes to try and blame CSXT for all of the delay, BMWED's own allegations show that the primary reason for the delay was lack of available federal funds to pay arbitrators. For example, even though Arbitrator Cohen set a hearing date of August 23, 2006, BMWED alleges that a hearing did not occur then, not only because of the actions of CSXT, but because no funding had been authorized by the NMB for such a hearing. Cmplt. ¶ 29. There is also no requirement or guarantee that an award will issue any time soon after the conclusion of the arbitration hearing, whenever that hearing might occur. For example, Arbitrator Wallin, who was appointed to sit with the Third Division as a referee to decide ten BMWED-CSXT contracting out cases, held a hearing on September 27, 2005. However, he did not issue his awards in those cases on behalf of the Third Division until late July 2006. See, e.g., Bhd. of Maint. of Way Employes & CSX Transp., Inc., NRAB 3d Div., Award No. 37830 (July 28, 2006) (Wallin, Arb.) (copy attached hereto as Exh. A). Thus, notwithstanding BMWED's rosy prediction that "it is likely that Mr. Cohen would have rendered a decision by now . . .," BMWED Opp. at 18, that prediction is contrary to BMWED's own allegations that the NMB never provided funding authorization to Arbitrator Cohen. In any event, it is pure speculation when, even if funding had been authorized for the August 23, 2006 hearing, Arbitrator Cohen

might have issued awards had CSXT not withdrawn the cases.[3]  Given that there is no way to know when a request for a referee will be made under Section 3, First (l); how long it will take for an award to be made after a referee has been appointed; or how available government funding and arbitrator caseloads will affect the timing of hearings and decisions from a Division of the NRAB, there is nothing absurd about Congress selecting the clear, objective standard of twelve months, measured from when a case was filed with the NRAB, as the benchmark for when a party can withdraw cases to a PLB.

Furthermore, Congress was obviously aware of Section 3, First (l) when it enacted Section 3, Second in 1966.  Congress therefore was aware that cases could still be pending at the NRAB after the appointment of a referee pursuant to Section 3, First (l).  Yet, Congress did not carve out an exception in Section 3, Second for such cases.  BMWED is now asking this Court to rewrite Section 3, Second in a manner that Congress did not do.  But, as the Supreme Court has said, "we are not free to rewrite the statute that Congress has enacted.  '[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'"  Dodd v. U.S., 545 U.S. 353, 359 (2005) (quoting from Hartford Underwriters Ins. Co. v. Union Planters Bank, 530 U.S. 1, 6 (2000)).  As explained, BMWED has failed to show that a literal application of Section 3, Second is absurd.

BMWED cites three Supreme Court cases for the proposition that this Court can "infer" a limitation on the otherwise plain meaning of Section 3, Second.  BMWED points to Chicago River, where the Court implied a right of action to enforce the RLA requirement that unions not

_____

[3]  BMWED is also wrong that CSXT's request for a PLB further delayed cases "by moving them back to the point of NRAB deadlock."  BMWED Opp. at 18.  The parties have already filed submissions with the NRAB in these cases, which will be transferred to the PLB.

strike over minor disputes; <u>Chicago & North Western Ry. Co. v. United Tranp. Union</u>, 402 U.S. 570, 576-78 (1971), where the Court found that the duties imposed by Section 2, First were judicially enforceable; and <u>Trans World Airlines v. Indep. Fed'n of Flight Attendants</u>, 489 U.S. 426, 441-42 (1989), which supposedly limited the scope of Section 2, Fourth's prohibition against carrier interference in the independence of unions.  BMWED Opp. at 17-18.  These cases do not support the proposition that the plain language of Section 3, Second can be ignored or rewritten by the courts.  In none of these cases did the Court adopt an interpretation of the RLA that was contrary to the express language of the RLA, as BMWED would have this Court do here.

CSXT's withdrawal of cases was not only in accordance with the express language and purpose of Section 3, Second, it was consistent with the historical application of that provision. BMWED has been unable to cite a single precedent of any kind that cases cannot be withdrawn from the NRAB pursuant to Section 3, Second after a referee has been appointed to sit with the NRAB.  While this is the first lawsuit of its kind of which CSXT is aware where such an argument has been made, whether cases were still considered "pending" after a referee was appointed or after the NRAB had scheduled a hearing has been raised in arbitration a few times. In each instance, the arbitrator found that Section 3, Second allowed the withdrawal of cases at least until the arbitrator had indicated how he or she was going to rule by circulating a written decision.  For example, as CSXT previously explained, in <u>Order of Ry. Conductors & Brakemen & Elgin, Joliet & E. Ry. Co.</u>, PLB No. 46, Award No. 1 (1968), Arbitrator Seidenberg found that the plain language of Section 3, Second permitted the withdrawal of cases after a referee had been appointed pursuant to Section 3, First (l).  CSXT Mem. at 11-12.  Arbitrator Seidenberg reasoned that Section 3, Second allowed cases to be removed at least up to the point in time

when the referee had made known to the parties how he or she would rule on the merits, e.g., by circulating a draft award to the partisan members of the NRAB. Award No. 1 at 17. BMWED tries to distinguish that Award by contending that "the award does not say whether any party to that case presented the sort of argument under Section 3, First (l) that is the basis for BMWED's claims here, and the arbitration panel did not even discuss the language of Section 3 First (l)." BMWED Opp. at 20 n.3. That is not true, as a review of Award No. 1 shows. While the arbitrator did not cite Section 3, First (l) in his analysis of the parties' arguments, the Award shows that the carrier there specifically relied upon Section 3, First (l) for the same argument made here by BMWED that, once a referee has been appointed, Section 3, Second does not permit removal of cases. See, e.g., Award No. 1 at 9 ("The Carrier also notes that the Congress in enacting the 1966 legislation did not disturb Section 3, First (l) of the [RLA]").

Award No. 1 refers to Award No. 14948 of the Third Division of the NRAB. Award No. 1 at 11. In that arbitration, the NRAB issued an award even though the carrier there had requested that the cases be listed with a PLB pursuant to Section 3, Second of the RLA. The referee who sat with the Third Division to make that award, Arbitrator Dolnick, explained in a separate opinion why he believed that the NRAB still could issue awards in those cases. At the time that the carrier made its request, the arbitration hearing had been held; he, as the referee, had circulated a draft award to the carrier and labor members of the Division, which ruled in favor of labor; the cases had been re-argued at the request of the carrier members of the Division; and, after re-argument, the referee indicated that he would not change his proposed award. See Transp. Commc'ns Employees Union & Mo. Pac. R.R. Co., NRAB 3d Div., Award 14948, at 14-15 (Nov. 18, 1966) (Dolnick, Arb.) (copy attached hereto as Exh. B). The proposed award was merely awaiting the formality of being adopted by the NRAB as an award of the NRAB when

the carrier advised it had requested a PLB. Arbitrator Dolnik reasoned that it would frustrate arbitration if a party could remove a case once the arbitrator had indicated his ruling on the merits. Arbitrator Seidenberg distinguished Award No. 14948 on the basis that there had been no indication by the referee how he would rule on the merits at the time the union requested that cases be withdrawn to a PLB.

In Sheet Metal Workers Intern'l Ass'n and Illinois Central Railroad, NRAB 2d Div., Award No. 11022 (Oct. 8, 1986) (Goldstein, Arb.) (copy attached hereto as Exh. C), a similar removal issue was addressed. After cases had been deadlocked and a referee appointed pursuant to Section 3, First (l), the carrier there notified the NRAB and union that it desired to establish a PLB pursuant to Section 3, Second to hear these cases, which by then had been pending at the NRAB for more than twelve months. At the arbitration hearing before the NRAB, the union argued the merits of its cases. The carrier argued only that the NRAB had lost jurisdiction because of its request to establish a PLB. The referee, Arbitrator Goldstein, sitting with the NRAB agreed with the carrier that "[b]ased on the clear language of the statute [§ 3, Second]," and the fact that the cases had been pending for more than twelve months, the NRAB no longer had jurisdiction over the cases. Award No. 11022 at 3. He also agreed with the reasoning of Award No. 1 of PLB No. 46 that Section 3, Second permitted the removal of cases at least up to the point in time when the arbitrator had circulated a draft decision.[4]

---

[4] Arbitrator Goldstein went further and found that Section 3, Second vested jurisdiction in a procedural neutral appointed pursuant to Section 3, Second, and not the NRAB, to resolve a dispute whether cases could be withdrawn from the NRAB. CSXT does not agree that a procedural neutral would have jurisdiction to resolve claims like those raised by BMWED in its Complaint, because they are disputes over interpretation of the RLA itself, as explained in CSXT's Response to NMB Motion to Dismiss at 8-11.

For the reasons set forth in CSXT's Response to the NMB's Motion to Dismiss, CSXT agrees with BMWED that arbitration precedents are not binding on this Court in connection with how the RLA should be interpreted and resolution of BMWED's claims that CSXT violated the RLA. But, these arbitration decisions are instructive in showing that, since the enactment of the 1966 Amendments, the language in Section 3, Second, in particular, the word "pending," has been given its plain everyday meaning. This Court does not need to decide whether, as the above arbitrators reasoned, cases might cease to be "pending" within the meaning of Section 3, Second at that point in time when the arbitrator has circulated a draft award, because, the facts, even as alleged by BMWED, show that the cases withdrawn by CSXT never came close to that point. Whatever the end point might be for when cases can no longer be considered to be pending for purposes of Section 3, Second, they are still clearly pending under any application of that term when a hearing has not yet been held.[5]

III.    There Is No Conflict Between Section 3, First (l) And Section 3, Second

Contrary to BMWED's argument, BMWED Opp. at 20-23, giving the word "pending" its plain meaning also does not produce any conflict between Section 3, First (l) and Section 3, Second. BMWED contends that the word "pending" should be construed not to apply to cases once a referee has been appointed pursuant to Section 3, First (l), even though they are literally still "pending" at the NRAB at that point in time. Otherwise, to allow the withdrawal of cases

---

[5] BMWED repeatedly exaggerates how far the cases had progressed with Arbitrator Cohen as the referee before CSXT made its PLB request. BMWED Opp. at 11, 13, 14, 30. BMWED's own Complaint shows that the only "ruling" he made adverse to CSXT was that a hearing could be scheduled for August 23, 2006, when CSXT contended that a hearing could not be held until after hearings had been had on longer pending cases at the NRAB. Cmplt. ¶ 24. BMWED does not contend that this "ruling" was on any aspect of the merits of the cases for which he had been appointed. Nor does BMWED argue that the cases for which Arbitrator Cohen was appointed were not still pending within the ordinary meaning of that term.

from the NRAB would conflict with the "mandate" of Section 3, First (l) that a referee appointed pursuant to that Section actually decide the cases.  However, there is no conflict.  First, as explained above, there is no such "mandate" in Section 3, First (l).  Second, Section 3, First (l) and Section 3, Second were enacted at different times to address different concerns.  Section 3, First (l) was enacted in 1934 to resolve the problem of deadlocks.  Section 3, Second was enacted in 1966 to address the problem of delays in the handling of cases by the various Divisions of the NRAB.  Given their different purposes, there simply is no conflict in giving the word  "pending" in Section 3, Second its plain meaning.  The removal of cases to a PLB does not frustrate the purpose of Section 3, First (l) to avoid deadlocks, because Section 3, Second contains similar mechanisms for breaking deadlocks.  For example, if the partisan members of a PLB cannot reach agreement on the disposition of a case, or on the selection of a referee, "either member of the board may request the Mediation Board to appoint such neutral person [i.e., an arbitrator] . . ." to be the third member of the PLB to break any tie vote.  45 U.S.C. § 153, Second.

Furthermore, under standard canons of statutory construction, courts must take into account that later enacted statutes can impact the meaning of earlier enacted legislation, even where the latter does not expressly amend the former.  The Supreme Court explained this principle, for example, in Food & Drug Administration v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 143 (2000):

> At the time a statute is enacted, it may have a range of plausible meanings.  Over time, however, subsequent acts can shape or focus those meanings. . . . This is particularly so where the scope of the earlier statute is broad but the subsequent statutes more specifically address the topic at hand.  As we recognized recently in United States v. Estate of Romani, "a specific policy embodied in a later federal statute should control our construction of the [earlier] statute, even though it ha[s] not been expressly amended." (citation omitted).

See also, e.g., Indep. Ins. Agents of Am., Inc. v. Hawke, 211 F.3d 638, 643 (D.C. Cir. 2000) (citing Brown & Williamson Tobacco Corp.).

While there is no conflict between these two provisions of the RLA, in giving meaning to both, the more specific policy in the later enacted Section 3, Second that a party be allowed to withdraw cases from the NRAB after they have been pending for twelve months must be given effect. The so-called "mandate" in Section 3, First (l) that the referee appointed to sit with a Division of the NRAB make an award has been modified by the second arbitration option Congress gave to carriers and unions in Section 3, Second that an award can instead be made by a referee sitting with a PLB.

If there is any conflict, it flows from BMWED's ill-conceived efforts to persuade this Court to judicially amend Section 3, Second by limiting its operation to cases pending at the NRAB before a referee has been appointed. Such cases could continue to sit at the NRAB longer than twelve months, but a carrier or union could not remove them to a PLB, contrary to the express terms of Section 3, Second.

IV.     There Is No Legal Basis For BMWED's Section 2, First Claim

BMWED's claim that CSXT's actions violated Section 2, First of the RLA is really nothing more than a repeat of its claim that CSXT's actions violated Section 3, First (l). In any event, BMWED has failed to show any legal basis for this claim.

BMWED explains in its Opposition that the CSXT actions which allegedly constitute a violation of Section 2, First's duty "to exert every reasonable effort to . . . settle all disputes . . ." were "defeating the ability of the neutral appointed by the NMB to decide the cases assigned to him, and by substantially delaying resolution of those cases . . ." BMWED Opp. at 23-24. But, these are the very same allegations that underlie BMWED's claim that CSXT violated Section 3,

First.  For example, in support of its Section 3, First (l) claim, BMWED argued "that removal of cases from a neutral referee after he or she has been appointed in order that the cases may be heard by another neutral is fundamentally at odds with Section 3 First (l)."  BMWED Opp. at 8.  Since the same actions underlie both claims, BMWED's Section 2, First claim falls because, as explained, the withdrawal of cases that have been pending for twelve months does not violate Section 3, First and is expressly authorized by Section 3, Second.

As for CSXT's argument that its actions cannot violate Section 2, First because they were expressly authorized by Section 3, Second, BMWED argues that CSXT is simply wrong that Section 3, Second permits the withdrawal of cases from the NRAB to a PLB after a referee has been appointed pursuant to Section 3, First (l).  BMWED Opp. at 24.  As CSXT demonstrated in its Memorandum in Support of its Motion to Dismiss and above, CSXT is not wrong about Section 3, Second.

BMWED mischaracterizes Chicago & North Western Ry. Co. v. United Transp. Union, 402 U.S. 570 (1971) ("C&NW") as holding "that the broad language used in Section 2 First imposed broad duties, and that the statute was designed for development of a common law filling in the range of duties imposed by the this provision . . . ."  BMWED Opp. at 25.  But, the Supreme Court held no such thing.  The Court itself never describes the duties imposed by Section 2, First as "broad" or states that courts are free to develop a "common law" by reading new duties into Section 2, First.  The Court's discussion of the development of a "common law" under the RLA was describing the congressional testimony of the principal union spokesman; it was not a holding of the Court.  To the contrary, as CSXT explained in its Memorandum in Support of its Motion to Dismiss, the Supreme Court, in describing the scope of the enforceable duty under Section 2, First, cautioned that "great circumspection should be used in going beyond

cases involving 'desire not to reach an agreement' . . . ." C&NW, at 579 n.11. BMWED completely ignores this caution and the actual holding of C&NW. Try as it may, BMWED cannot distinguish the precedents cited by CSXT that have heeded this caution and rejected prior attempts by BMWED to tease new duties out of Section 2, First outside of the bargaining context.

Further, the additional cases that BMWED cites in its Opposition all involved some aspect of the duty to bargain; none involved application of the minor dispute arbitration procedures.[6] But, whatever the scope of the duties imposed by Section 2, First, BMWED has not cited any precedent that a carrier or union violate any duty under Section 2, First when its actions are authorized by an express provision of the RLA, Section 3, Second in this case.

The other actions that BMWED contends evidence a violation of Section 2, First were CSXT's position that a hearing for the cases for which Arbitrator Cohen was appointed could not, consistent with the procedures of the NRAB, be scheduled before cases that had been pending longer at the NRAB than these cases and CSXT's request that Arbitrator Cohen recuse himself. According to BMWED, these requests violated Section 2, First, because they further delayed the resolution of cases for which Arbitrator Cohen had been appointed. BMWED Opp. at 23-24, 29-30. First, it is speculative that these CSXT actions delayed the resolution of these ten cases. Even if they did, making arguments to the referee concerning his authority does not violate Section 2, First. By definition, any time a party makes an argument to the referee, there

---

[6] The BMWED's own descriptions of Int'l Ass'n of Machinists v. Transportes Aeros Mercantiles Pan Americandos, 924 F.2d 1005 (11th Cir. 1991), Ass'n of Flight Attendants v. Horizon Air Indus., Inc., 976 F.2d 541 (9th Cir. 1992) and Delta Air Lines, Inc. v. Air Line Pilots Ass'n Int'l, 238 F.3d 1300 (11th Cir. 2001), show that all of the cases involved the duty to bargain. None involved application of the RLA minor dispute arbitration procedures or any other issue remotely relevant to the instant lawsuit.

is the potential for some delay.  Moreover, as explained, BMWED's own allegations show that at the time CSXT made these arguments, the NMB had never authorized any funding for Arbitrator Cohen to proceed in any event.

Second, it was the position not only of CSXT, but also the carrier members on the NRAB, that BMWED was seeking special treatment for cases for which Cohen was appointed by leapfrogging them over many other cases that had been pending longer at the NRAB and that this tactic violated the established procedures of the NRAB.  BMWED's actions were unfairly delaying the resolution of those cases.  There was nothing frivolous about this position.

Third, CSXT had the right to expect that a referee will be truly neutral and not have a conflict or appearance of conflict.  The RLA requires that referees be neutral.  45 U.S.C. § 153, First (l) (referee must be "neutral").  CSXT did not review Arbitrator Cohen's background until after BMWED was the first to ask a referee appointed to sit with the NRAB to hear BMWED-CSXT cases to recuse himself, because of the supposed appearance of a conflict.  As shown in Exhibit 17 to the Powers Declaration, BMWED asked Arbitrator Javits to recuse himself and he did.  When CSXT subsequently reviewed the background of Arbitrator Cohen, CSXT discovered that he had failed to disclose that, prior to becoming an arbitrator in 1999, he had been a longtime partner in a union-side law firm and one of his principle clients was the Teamsters.  BMWED is a subdivision of the Teamsters.  CSXT was rightfully concerned that the Arbitrator had a prior representational relationship with the other party to the arbitration.  Section 2.B.1 of the Code of Professional Responsibility for Arbitrators of Labor-Management Disputes of the National Academy of Arbitrators requires that, before an arbitrator accept an appointment, the arbitrator must advise of "any current or past . . . representational, or consultative relationship with any company or union involved in a proceeding . . . ."  Section 2.B.5 of the Code provides

that "after appropriate disclosure, the arbitrator may serve if both parties desire." Powers Decl., Exh. 17 at 2. Arbitrator Cohen declined to recuse himself. But, the fact that CSXT asked that he do so did not violate Section 2, First. It is rather ironic that BMWED alleges that such a request violated Section 2, First when it too sought the recusal of an arbitrator.

Ultimately, besides being without any legal merit, BMWED's complaints that CSXT's actions violate Section 2, First, because they might delay the resolution of ten, out of hundreds and hundreds of BMWED-CSXT contracting out cases, cannot be taken seriously. BMWED's lawsuit against the NMB and CSXT will delay the resolution of these ten cases far longer than any actions alleged of CSXT or the NMB. If BMWED was sincerely interested in progressing these ten cases in arbitration, it would have not contested their withdrawal, which was clearly allowed by the plain language of Section 3, Second, but agreed that they, along with the other cases withdrawn by CSXT, be heard by a PLB.

<u>Conclusion</u>

For the reasons stated in this Reply and in CSXT's Memorandum in Support of its Motion to Dismiss, the Court should find that CSXT's actions were authorized by Section 3, Second of the RLA and dismiss the Second and Third Causes of Action in BMWED's Complaint as a matter of law.

Dated: January 5, 2006

Respectfully submitted,


/s/ Ronald M. Johnson
Ronald M. Johnson
D.C. Bar No. 262311
AKIN GUMP STRAUSS HAUER
& FELD LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 887-4000
Fax: (202) 887-4288
rmjohnson@akingump.com

**Attorney for Defendant,**
**CSX Transportation, Inc.**

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 5th day of January, 2006, I electronically filed the foregoing

*Reply In Support Of Motion To Dismiss Of CSX Transportation, Inc.* with the Clerk of the Court

using the CM/ECF system, which will send notice of electronic filing to counsel of record and

complete service as required by Fed. R. Civ. P. 5.

I further certify that I mailed the foregoing document by United States mail to the

following:

Richard S. Edelman, Esq.
O'Donnell, Schwartz & Anderson, P.C.
1900 L. St., N.W.
Suite 800
Washington, D.C.  20036

Peter Bryce, Esq.
United States Department of Justice
Civil Division, Rm. 7308
20 Massachusetts Ave., N.W.
Washington, D.C.  20530

<u>/s/ Ronald M. Johnson</u>
Ronald M. Johnson