# Exhibit A

Form 1           NATIONAL RAILROAD ADJUSTMENT BOARD
                         THIRD DIVISION

                                                    Award No. 37830
                                                    Docket No. MW-38271
                                                    06-3-04-3-203

   The Third Division consisted of the regular members and in addition Referee Gerald E. Wallin when award was rendered.

                          (Brotherhood of Maintenance of Way Employes
   PARTIES TO DISPUTE:    (
                          (CSX Transportation, Inc.

STATEMENT OF CLAIM:

   "Claim of the System Committee of the Brotherhood that:

   (1) The Carrier violated the Agreement when it assigned outside forces (Asplundh Tree Service) to perform Maintenance of Way work (mowing right of way) at road crossings on the Georgia and Abbeville Subdivisions of the Atlanta Service Lane beginning on January 20, 2003 and continuing, instead of Atlanta Service Lane employes C. Fowler, Jr., M. Bolton, M. Farmer and W. Norris [System File B13400903/12(03-0428) CSX].

   (2) As a consequence of the violation referred to in Part (1) above, Claimants C. Fowler, Jr., M. Bolton, M. Farmer and W. Norris shall now each be compensated at their respective straight time rates of pay for an equal proportionate share of the total man-hours expended by the outside forces in the performance of the aforesaid work beginning January 20, 2003 and continuing."

FINDINGS:

   The Third Division of the Adjustment Board, upon the whole record and all the evidence, finds that:

Form 1  
Page 2

Award No. 37830  
Docket No. MW-38271  
06-3-04-3-203

The carrier or carriers and the employee or employees involved in this dispute are respectively carrier and employee within the meaning of the Railway Labor Act, as approved June 21, 1934.

This Division of the Adjustment Board has jurisdiction over the dispute involved herein.

Parties to said dispute were given due notice of hearing thereon.

## BACKGROUND:

This case is one of ten dockets considering the propriety of the Carrier's use of outside contractors to perform work allegedly covered by the Scope Rule of the applicable Agreement. These dockets had not been pending before the Board as long as other cases also awaiting hearing. As a result, a controversy arose over whether it would be procedurally proper to have these cases heard out of chronological order. The controversy was resolved on a non-precedent setting basis by the Board Members and these cases were heard with the parties present on September 27, 2005. Because of that resolution by the Board Members, we have made no procedural findings regarding the order in which cases should be heard by the Board and nothing in this Award should be construed as making any such findings.

The instant dispute arose under the parties' June 1, 1999 Agreement. That Agreement replaced some 13 prior Agreements that existed on the various component railroads that have been merged over time into the present Carrier. The resulting Scope Rule was significantly different from any of the previous Scope Rules. In the years after the Agreement became effective, the Organization filed a number of claims to contest the Carrier's use of outside contractor forces to perform work believed to be covered by the new Scope Rule. It quickly became apparent that the parties had widely divergent views of how the new Scope Rule applied to the contracting of work.

The parties established a series of Public Law Boards to resolve the pending claims. Public Law Board No. 6508 issued its consolidated Award on eight claims

Form 1                                                              Award No. 37830
Page 3                                                    Docket No. MW-38271
                                                                             06-3-04-3-203

on October 7, 2003. Five more Awards were issued by Public Law Board No. 6510 in January 2005.

The Awards of both PLBs provide extensive discussion about the evidentiary analysis they conducted on voluminous records to determine the proper meaning of the Scope Rule. As we read their Awards, both reached essentially the same conclusion. Nonetheless, the parties remain at odds about the permissible situations in which the Carrier may contract out scope covered work under the new Scope Rule. We understand that, as PLB No. 6508 said at page 42, ". . . scores of other similar disputes remain unresolved by the parties. . ." and are presently at the Board awaiting adjudication.

This paragraph and the following paragraph are preliminary comments offered for clarification at the outset of this decision. At the Referee Hearing, both parties stated that they were presenting essentially the same evidence and argument that they presented to PLB Nos. 6508 and 6510. The parties' Submissions in this case are voluminous. The Organization's Submission consists of 984 pages; the Carrier's consists of 497 pages. After careful review of the Submissions and the Awards of PLB Nos. 6508 and 6510, we agree that, although the parties may have emphasized their various contentions differently before us here and there, they did present substantially the same evidence, contentions, and interpretive issue to us that they presented to PLB Nos. 6508 and 6510.

In addition, the consolidated Award of PLB No. 6508 and the first Award of PLB No. 6510 are lengthy, consisting of 96 and 46 pages, respectively. Both set forth the entire text of the pertinent Agreement language including the contents of relevant Appendices and Letters of Agreement. In addition, both provide extensive detail about the contentions of the parties concerning the proper application of the new Scope Rule. PLB No. 6508 described each party's position in 26 pages (pp. 16-41). PLB No. 6510 used some 16 pages to do the same (pp. 17-32). In the interest of brevity and cost efficiency, we see no need to rewrite herein what has already been written twice before in great detail. Instead, we refer interested readers to the Awards of PLB Nos. 6508 and 6510 for the complete text of pertinent Agreement language as well as a thorough description of the parties' respective positions and supporting contentions. Accordingly, we incorporate by reference those portions of the Awards of PLB Nos. 6508 and 6510 as though fully set forth herein.

Form 1  
Page 4

Award No. 37830  
Docket No. MW-38271  
06-3-04-3-203

Although we have incorporated relevant Award portions from PLB Nos. 6508 and 6510, we offer the following statements of each party's position. They are intentionally condensed into a few sentences for purposes of our analysis. According to the Organization, the new Scope Rule established an "iron-clad" bar to contracting out any work covered by the Scope Rule unless the involved General Chairman approved; the inclusion of the National Agreements on subcontracting did not diminish the General Chairman's authority in any way. According to the Carrier, however, no such absolute bar was created by the new Scope Rule and the ability to contract out work was preserved by inclusion of the National Agreements. As a result, the Carrier need only give notice of the proposed contracting transaction and conference on it with the General Chairman if requested; it could nonetheless properly proceed with contracting out the work as long as it had a "legitimate" business reason to do so.

The following is the text of the new Scope Rule. Although in the Agreement they are unnumbered, we have numbered the first five paragraphs for ease of discussion. The numbers reflect the same numbering the parties used in their presentations to the Board.

### SCOPE

"[1] These rules shall be the agreement between CSX Transportation, Inc., and its employees of the classifications herein set forth represented by the Brotherhood of Maintenance of Way Employees, engaged in work recognized as Maintenance of Way work, such as inspection, construction, dismantling, demolition, repair and maintenance of water facilities, bridges, culverts, buildings and other structures, tracks, fences, road crossings, and roadbed, and work which as of the effective date of this Agreement was being performed by these employees, and shall govern the rates of pay, rules and working conditions of such employees.

[2] The following work is reserved to BMWE members: all work in connection with the construction, maintenance, repair, inspection or dismantling of tracks, bridges, buildings, and other structures or

Form 1                                                        Award No. 37830
Page 5                                              Docket No. MW-38271
                                                                      06-3-04-3-203

facilities used in the operation of the carrier in the performance of common carrier service on property owned by the carrier. This work will include rail, guard rail, switch stand, switch point, frog, tie, plate, spike, anchor, joint, gauge rod, derail and bolt installation and removal; erection and maintenance of signs, such as mile posts, speed restriction signs, resume speed signs, crossing and station signs, warning signs, and signs attached to buildings or other structures (except billboards); construction of track panels; welding, grinding, burning, and cutting; ballast unloading, regulating, equalizing, and stabilizing; track and switch undercutting; cribbing between ties; track surfacing and lining; snow removal (track structures and right of way); road crossing installation and renewal work; asphalting of road crossings (unless required by outside agencies), culvert installation, repairs, cleaning and removal; yard cleaning; security and ornamental fences; distribution and collection of new and used track, bridge and building material; operate machines, equipment, and vehicles; transporting maintenance of way employees; mowing; installation, maintenance, and repairs of turntables, platforms, walkways, and handrails; head wall and retaining wall erection; cleaning, sandblasting, and painting of machines, equipment, bridges, turntables, platforms, walkways, handrails, buildings, and other structures or facilities; rough and finish carpentry work; concrete and masonry work; grouting, plumbing, and drainage system installation, maintenance, and repair work; cooling and heating system installation, maintenance, and repair work; fuel and water service work; roof installation, repairs, and removal; drawbridge operation and maintenance and any other work customarily or traditionally performed by BMWE represented employees. In the application of this Rule, it is understood that such provisions are not intended to infringe upon the work rights of another craft as established. It is also understood that this list is not exhaustive.

[3] It is agreed that in the application of this Scope that any work which is being performed on the property of any former component railroad by employees other than employees covered by this

Form 1                                                                                          Award No. 37830
Page 6                                                                                          Docket No. MW-38271
                                                                                                06-3-04-3-203

    Agreement may continue to be performed by such other employees at the locations at which such work was performed by past practice or agreement on the effective date of this Agreement; and it is also understood that work not covered by this Agreement which is being performed on the property of any former component railroad by employees covered by this Agreement will not be removed from such employees at the locations at which such work was performed by past practice or agreement on the effective date of this Agreement.

    [4]  In the event the carrier plans to contract out work within the scope of this Agreement, except in emergencies, the carrier shall notify the General Chairmen involved, in writing, as far in advance of the date of the contracting transaction as is practicable and in any event not less than fifteen (15) days prior thereto. "Emergencies" applies to fires, floods, heavy snow and like circumstances.

    [5]  If the General Chairmen, or his representative, requests a meeting to discuss matters relating to the said contracting transaction, the designated representative of the carrier shall promptly meet with him for that purpose. Said carrier and Organization Representatives shall make a good faith attempt to reach an understanding concerning said contracting, but, if no understanding is reached, the carrier may nevertheless proceed with said contracting, and the organization may file and progress claims in connection therewith.

    All National Contracting Agreements apply, see Appendix 'M'

    Definitions:

    (1) The term 'union representative' means an individual certified by the Brotherhood of Maintenance of Way Employes.

    (2) Except as otherwise specified, all reference to number of days in this Agreement means calendar days.

Form 1  
Page 7

Award No. 37830  
Docket No. MW-38271  
06-3-04-3-203

(3) The terms 'displace' and 'displaced' as used in this Agreement mean physical displacement.

(4) The term 'change in residence' as used in this Agreement means outside a radius of 30 miles from his residence. The last recorded address with the Company shall be his residence."

(5) Except as defined otherwise, the term 'fixed headquarters' as used in this Agreement means a position that is stationary, non-mobile, that an incumbent's day begins and ends at that assigned fixed location."

As previously noted, we have the same interpretive issue before us that confronted PLB Nos. 6508 and 6510. As we read the Award of PLB No. 6508, it saw ambiguity inherent in the new Scope Rule resulting from the combination of the use of the word "reserved" and the incorporation of language from Article IV of the May 17, 1968 National Agreement and the reference to other National Agreements. However, PLB No. 6508 recognized that the word "reserved" is a term of art and has a long history of interpretation in the railroad industry. Accordingly, when the word appeared in paragraph [2] of the new Scope Rule, PLB No. 6508 concluded at page 44 that it ". . . reflects a calculated and knowing decision to enhance the pre-existing strong presumption that bargaining unit members must perform the subsequently enumerated work." The Award went on to state on the same page, "Thus the second paragraph of the Scope Rule clearly and plainly indicates that only BMWE members have a right to perform the enumerated work."

Despite the strong presumption flowing from the use of reservation of work terminology, PLB No. 6508 determined that General Chairmen were not vested with the sole authority to bar the Carrier from contracting out work if they failed to reach an understanding at the applicable conference. Instead, PLB No. 6508 found that the parties, by the language they used in their new Scope Rule, preserved the ability to submit disputes to arbitral review to be decided on a case-by-case basis as their facts dictate. In this regard, however, PLB No. 6508 went on to find, at page 46, that ". . . the Carrier must demonstrate a highly compelling reason to rebut the very strong presumption that the work covered by the second paragraph of the Scope Rule will be performed by BMWE members." At page 47, PLB No. 6508

Form 1                                                    Award No. 37830
Page 8                                          Docket No. MW-38271
                                                                       06-3-04-3-203

determined that any arbitral review should subject the Carrier's justification for contracting out scope covered work to "strict scrutiny." PLB No. 6508 also rejected full employment and/or lack of employees on furlough as sufficient reasons to deny a compensation remedy.

PLB No. 6510 approached its interpretive task by breaking down the overall dispute into four issue areas for discussion. First, it addressed the question of whether the Award of PLB No. 6508 was palpably erroneous in part, as the Organization argued, after it rejected the contention that General Chairmen were vested with veto authority. As its second and third issues, PLB No. 6510 dealt with the respective burdens of proof that the parties must satisfy to prevail in the arbitration of any given contracting dispute. Finally, PLB No. 6510 discussed the effect of past practice in light of the new Scope Rule language.

As we read the Award of PLB No. 6510, it did not find any portion of the Award of PLB No. 6508 to be palpably erroneous or repugnant to the parties' new Agreement. Indeed, it echoed the determination of PLB No. 6508 that the use of the word "reserved" in paragraph 2 was significant. It said, at page 35, that ". . . the inclusion of the term 'reserved' in Paragraph 2 of the Scope Rule represented the informed decision by the negotiators of the current System Agreement to strengthen the current Scope Rule as to its application and meaning." PLB No. 6510 went on to find that the parties had not intended to totally prohibit contracting of scope covered work even when the General Chairmen did not consent. At page 39, PLB No. 6510 rejected the Organization's contention that the new Scope Rule represented an absolute bar on the Carrier's ability to contract out work.

Turning to the Organization's burden of proof, PLB No. 6510 said, at page 39, ". . . all that is necessary is proof that the specific work falls within the categories enumerated under Paragraph 2 as reserved to members of this Organization." At page 11 of its Award 6, PLB No. 6510 also described this burden as a "low standard of proof."

As to the Carrier's respective burden of proof, PLB No. 6510 observed, at page 40, that the ". . . Organization and these claimants cannot effectively grieve unless they are made aware of the business justifications for contracting out, the reasons why management has invoked its ability to contract out in the specific

Form 1  
Page 9

Award No. 37830  
Docket No. MW-38271  
06-3-04-3-203

instance. . . ." PLB No. 6510 went on to find that, "Persuasive specific evidence must be presented from the Carrier that 'a compelling reason exists to contract out the disputed work.'" Finally, PLB No. 6510 said, at page 41, that ". . . the Carrier is now obligated to present its affirmative defenses at the conference and in the handling of the dispute on the property."

Finally, as to the effect of any past practices, PLB No. 6510 determined, at page 42, "Past practices may not trump the right of claimants to do the enumerated work 'reserved to members of the BMWE' by paragraph 2, after the negotiation of the current Scope Rule."

As we read the first Award of PLB No. 6510, it entirely endorsed the interpretive findings of PLB No. 6508 and followed them without change. Taken together, the findings of these two PLBs determined that when the sophisticated and experienced negotiators for the instant parties used explicit reservation of work terminology, they were recognizing, as PLB No. 6508 said at page 46, that ". . . the pendulum is now further on the side of the Organization." When work is <u>reserved</u> to an Organization, it will be performed by the members of the Organization unless truly compelling circumstances, that can pass <u>strict scrutiny</u> in arbitration, exist to the contrary. This effectively means that the Carrier must use due diligence to inspect its property to detect the need for project work covered by the new Scope Rule and, where the need for such work is or should have been identified through the exercise of due diligence, the Carrier will plan for performing the work with its own employees represented by the Organization. Such planning should include any necessary hiring, training, equipping, and scheduling of such forces. Full employment and/or lack of furloughed employees does not suffice as a defense to a compensation remedy if a violation of the Agreement is determined. However, where circumstances arise that provide the Carrier with truly compelling reasons to use a contractor to perform the work, the Carrier should be able to do so. If the justification is disputed by the General Chairman and cannot be resolved by the parties, whether compelling reasons were demonstrated by the Carrier is a question of fact to be decided in arbitration after due consideration of all relevant circumstances shown by the parties' Submissions.

After careful consideration of the evidence in the record before us, we find no basis to quarrel with the interpretive findings of either PLB No. 6508 or PLB No.

Form 1  
Page 10

Award No. 37830  
Docket No. MW-38271  
06-3-04-3-203

6510. Accordingly, we endorse those findings in their entirety and adopt them as our own. In addition, however, we provide two additional considerations in support of those findings. They both respond to the Organization's contention that the new Scope Rule is an absolute bar to the contracting of scope covered work unless the involved General Chairman approves. First, it is clear from Article IV of the 1968 National Agreement as well as the 1981 Berge-Hopkins Letter of Understanding, that the parties intended to establish a contracting review process based on good faith and fair dealing with each other. However, the Organization's position leaves the door open to allow the General Chairman to <u>unreasonably</u> withhold approval. Thus, despite the unlikelihood of its occurrence, it is conceivable that a contracting situation could arise that is compelling by any objective standard of review, but the involved General Chairman could nevertheless unreasonably withhold approval out of pique, retaliation for some other perceived transgression, or simply as a show of power. Such a possibility is such an affront to the obligations of good faith and fair dealing that an opportunity for objective arbitral acceptance of the compelling reasons must be available.

Our second consideration arises from the <u>non sequitur</u> embedded in the Organization's position. According to the Organization, the new Scope Rule prohibits the contracting of scope covered work unless there is a stated exception. The Organization says there are only three: First, there is an exception for billboards in paragraph 2. Second, there is also an exception in the same paragraph for asphalt paving of road crossings if required by outside agencies. Finally, paragraph 3 provides an exception for scope covered work performed by other craft employees on the effective date of the Agreement; those employees may continue to perform it. Significantly, the Scope Rule does not explicitly provide an exception for contracting work when required by genuine emergency circumstances. The parties did, however, provide for an emergency exception to the notice requirement in paragraph 4. Indeed, such an exception was not part of the text of Article IV of the 1968 National Agreement so it was deliberately added by these parties. However, central to the Organization's position is that paragraph 4 of the new Scope Rule, like its corresponding paragraph in Article IV of the 1968 National Agreement, pertains only to the notice procedure and does not confer any substantive right to contract work. It simply does not follow that the Carrier would be entirely excused from giving notice before contracting out work in true emergencies but should thereafter be found to have violated the Agreement if it actually did contract out the

Form 1                                                      Award No. 37830
Page 11                                             Docket No. MW-38271
                                                                         06-3-04-3-203

emergency work because there was no stated exception giving it the substantive right to do so.

Given the rationale expressed by PLB Nos. 6508 and 6510 and the two considerations described above, we also find that the new Scope Rule does permit, by implication, an exception for contracting out scope covered work for compelling reasons that will satisfy a "strict scrutiny" standard of review.

Turning to the instant claim, the Organization challenged the Carrier's use of Asplundh Tree Service to perform land clearing at several thousand passive road crossings in three regions of its system. The crossings in question were protected only with crossbucks. The clearing work removed trees, brush, and other vegetation several hundred feet either side of the road crossing to improve sight lines and oncoming train observation distances for motorists crossing the Carrier's tracks.

Although the parties developed an extensive record on the property concerning the merits of the instant claim, the Carrier objected to the procedural validity of the claim on the ground that it did not comply with the time limitation of Rule 24(a). Therefore, we must deal with the Carrier's objection as a threshold matter. The Rule reads, in pertinent part, as follows:

> "A claim or grievance must be presented, in writing, by an employee or on his behalf by his union representative to the Designated Officer, or their designated official within sixty (60) days from the date of the occurrence on which the claim is based. * * *"

The Carrier gave the Organization notice of its plans to contract out the entire project by letter dated March 6, 2002. The notice was mailed to four General Chairmen and included information about what the Carrier described as specialized equipment that it did not own and could not lease for the project. The notice also included some 110 pages listing up to 40 locations per page where the clearing work would be done by the contractor. The work was anticipated to begin on March 22, 2002.

Form 1  
Page 12

Award No. 37830  
Docket No. MW-38271  
06-3-04-3-203

One of the General Chairmen and a Vice-General Chairman attended the conference on behalf of the Organization on March 12 and later objected to the Carrier's plans by letter dated March 18, 2002. The Organization took the position that the work was covered by the new Scope Rule which did not permit contracting of covered work for the reasons provided by the Carrier. Both parties continued to skirmish over the propriety of the contracting transaction thereafter. The Carrier did so by letter dated May 24 and the Organization by letter of June 24, 2002.

On March 1, 2003, nearly one year after the conference on the notice, the Organization filed its claim on a continuing basis to challenge the use of the contractor. It alleged that the contractor began work on the Georgia and Abbeville subdivisions on January 20, 2003.

On the property, the Carrier asserted that the work actually began elsewhere on the Carrier's system, after a brief delay, on May 20, 2002, which was some ten months prior to the filing of the instant claim. This start date was not effectively refuted by the Organization. The Carrier also contended that the Organization did not have a continuing claim that could be properly filed at any time; the Carrier's position was that the claim had to have been filed within 60 days of the beginning of the initial work by the contractor. We agree.

It is well settled that when potential liability arises from a single event, in this case the system-wide contracting transaction, the aggrieved party has, under Rule 24(a), only 60 days from the date when the allegedly prohibited work begins to file a claim. It does not matter that the allegedly prohibited work by the contractor goes on for an extended period of time in various locations; each successive day of allegedly prohibited work does not create a new violation. See, for examples, Third Division Awards 23953, 26689, 28919 and 29894 and Award 2 of Public Law Board No. 6525.

It must be remembered that the parties replaced their former 13 separate Labor Agreements. They now have a single, system-wide Agreement. The project in question was system-wide. The Organization's objection to the project was system-wide. Thus, when the disputed work began wherever it did on the system, it triggered the running of the claim filing time limit. On this record, there is no evidence that the Carrier concealed the actual start date of the system work.

Form 1                                                             Award No. 37830
Page 13                                         Docket No. MW-38271
                                                                                                   06-3-04-3-203

Moreover, the record does not establish that the Organization has excusable lack of knowledge about the actual start date of the work on the system. Thus, for its claim to be valid, the claim must have been filed within 60 days of May 20, 2002. It was not.

      Given the foregoing factors, we find the instant claim is not procedurally valid in compliance with the parties' Agreement. Accordingly, it must be dismissed. As a result, we do not reach any of the substantive issues raised by the parties' Submissions.

## AWARD

Claim dismissed.

## ORDER

      This Board, after consideration of the dispute identified above, hereby orders that an Award favorable to the Claimant(s) not be made.

                                              NATIONAL RAILROAD ADJUSTMENT BOARD
                                                             By Order of Third Division

Dated at Chicago, Illinois, this 28th day of July 2006.