# Exhibit B



Award No. 14948
Docket No. TE-12372

NATIONAL RAILROAD ADJUSTMENT BOARD

THIRD DIVISION

David Dolnick, Referee

PARTIES TO DISPUTE:

TRANSPORTATION-COMMUNICATION EMPLOYEES UNION
(Formerly The Order of Railroad Telegraphers)

MISSOURI PACIFIC RAILROAD COMPANY

STATEMENT OF CLAIM: Claim of the General Committee of The Order of Railroad Telegraphers on the Missouri Pacific Railroad, that:

1. Carrier violated Mediation Agreement (A-4078 ORT) (A-4098 BRC) when on October 19, 1959, it permitted or required employes not covered by the Telegraphers' Agreement to perform the work of perforating tape not in accordance with the terms or intent of that Agreement;

2. Carrier continues to violate the Agreement by requiring employes not covered by the Telegraphers' Agreement to perform that work;

3. Carrier shall discontinue the violation of the Agreement and shall pay to Mrs. L. E. Gregory 8 hours at the pro rata rate of the minimum rate of pay for "GM" Telegraph Office, St. Louis, for October 19 and 20, 1959, and shall pay Mrs. M. D. Ringling 8 hours at the same rate for October 21, 1959 (these two being identified as senior extra available telegraphers) and shall pay to the senior idle telegrapher, extra preferred, for each day this violation continues.

EMPLOYES' STATEMENT OF FACTS: There is in existence a mediation agreement dated 27th day of July, 1953, which reads as follows:

"MEDIATION AGREEMENT
GUY A. THOMPSON, TRUSTEE
MISSOURI PACIFIC RAILROAD COMPANY, DEBTOR
THE ORDER OF RAILROAD TELEGRAPHERS
BROTHERHOOD OF RAILWAY AND STEAMSHIP CLERKS,
FREIGHT HANDLERS, EXPRESS AND STATION EMPLOYES

THIS AGREEMENT is made between Guy A. Thompson, Trustee, Missouri Pacific Railroad Company, Debtor, hereinafter referred to as Carrier; The Order of Railroad Telegraphers, hereinafter referred to as Telegraphers; and the Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employes, hereinafter

7. Claims were subsequently filed and progressed through the proper channels on the Carrier's property and finally declined by the Chief Personnel Officer in a letter dated February 18, 1960, addressed to General Chairman G. L. McDonald of the Telegraphers' Organization, a portion of which is quoted below for the convenience of the Board:

"Effective 8:00 A. M., Monday, October 19, 1959, teletypes were placed in service in the Service Bureau at St. Louis which were connected to perforating machines located in 'GM' Telegraph Office at St. Louis. Messages typed on this new equipment by clerks in the Service Bureau resulted in the automatic production of perforated tapes in 'GM' Office for transmission by telegraphers in 'GM' Office. This new process completely eliminated the need for transmission of messages from the Service Bureau to 'GM' Office via pneumatic tube as well as the need for the perforation of tapes for such communications by employes in 'GM' Office. This is not in any manner a violation of the Telegraphers' Agreement.

It is your contention that Clerks in the service bureau are prohibited by the Agreement of August 15, 1953, from operating teletype equipment in that office. We are unable to find any such prohibition either by agreement provision or practice. Paragraph (d) of Mediation Agreement of August 15, 1953, clearly provides: 'When such types of work now being otherwise performed are traditionally of the craft of clerks and are compiled on printer telegraph machines (teletypes) and simultaneously transmitted to intra-city or intra-terminal points, or reperforated for transmission to other cities and/or terminals, such work will be performed by employes represented by the Clerks.' These provisions clearly support Carrier's position in this case.

The work being performed here is nothing more than typing of communications which clerks in the Service Bureau have always done. The need for re-typing for production of a perforated tape has disappeared as this work is performed by automation. Telegraphers can have no claim to work which is performed by the automatic operation of a machine. The Adjustment Board has held in numerous cases that when an automatic machine is installed to perform a certain function, the employe who previously performed that function is not entitled to remain simply to watch the automatic machine operate."

8. The decision was rejected by the Employes and conference was held in the office of the Chief Personnel Officer at St. Louis, Missouri on October 24, 1960, but the dispute could not be resolved.

(Exhibits not reproduced.)

OPINION OF BOARD: Prior to October 19, 1959, a clerk in the Service Bureau typed in duplicate a report of cars moving over Carrier's lines. A copy was retained in the Service Bureau and the original was sent to the Communications Department through a pneumatic tube. At the Communications Department, a telegrapher copied the typewritten report on a perforating machine, which transformed that report on a perforated tape. The telegrapher then ran the perforated tape through a transmitter to its destination.

Teletype machines were placed in operation in the Service Bureau on October 19, 1959. They replaced the typewriters. They were connected to a

14948                                    6

reperforating machine in the Communications Department. Effective on that date, a clerk typed the report on the teletype machine in the Service Bureau. That teletype machine simultaneously caused the same message to be reproduced on a perforated tape by a reperforating machine in the Communications Department. A telegrapher in the Communications Department then inserted the perforated tape in a transmitter. The typed report was retained in the Service Bureau.

Printer telegraph machines, hereafter referred to as teletype machines, have been operated by both clerks and telegraphers. As a result of a dispute concerning the operation of said teletype machines, the Carrier, the Clerks and the Telegraphers entered into an agreement under date of July 27, 1953 which defines and allocates work of teletype machines to each of the two crafts.

This agreement provides that Telegraphers "will continue to perform on printer telegraph machines (teletypes) such work as they have traditionally and customarily performed on said machines . . ." The primary function of the teletype machine in the Service Bureau was to reproduce the message on perforated tape on a reperforating machine in the Communications Department. Typing the message was only an incidental part of that function. Previously, Telegraphers only traditionally and customarily operated tape perforating machines. Clerks only typed the message on a typewriter. Operating a machine which reperforates a message on a tape and at the same time types it on paper is not work which belongs to clerks, but to Telegraphers under the July 27, 1953 Agreement.

There is no merit to Carrier's position that Telegraphers are assigned to communication work and that this function has not been disturbed. There is also no merit to the argument that Telegraphers do not have exclusive right to perforate tape. Neither of these contentions are valid because of the express language in the tripartite agreement.

Neither is there a contradiction between paragraph (a) and paragraphs (c) and (d) of the July 27, 1953 Agreement. Paragraph (a), by its specific terms takes precedence over the general terms of paragraphs (c) and (d).

Award 9913 is not applicable because here the work of the Telegrapher is preserved by a special agreement.

On the basis of the entire record, it must be concluded that the work in question belongs to Telegraphers.

FINDINGS: The Third Division of the Adjustment Board, upon the whole record and all the evidence, finds and holds:

That the parties waived oral hearing;

That the Carrier and the Employes involved in this dispute are respectively Carrier and Employes within the meaning of the Railway Labor Act, as approved June 21, 1934;

That this Division of the Adjustment Board has jurisdiction over the dispute involved herein; and

14948                                   7

That Carrier violated the Mediation Agreement of July 27, 1953.

### AWARD

Claim sustained.

NATIONAL RAILROAD ADJUSTMENT BOARD
By Order of THIRD DIVISION

ATTEST: S. H. Schulty
Executive Secretary

Dated at Chicago, Illinois, this 18th day of November 1966.


### CARRIER MEMBERS' DISSENT TO AWARD 14948, DOCKET TE-12372

This Board erred in rendering this so-called Award. It is invalid and non-enforceable for the following, among other reasons:

(1) This Board did not have jurisdiction to make the Award.

(2) The Award ignores the vital interest and right of the Clerks' Union, which is also a party to the contract. It takes away from the clerks work which they have always done and gives it to the telegraphers contrary to the express language of the agreement, and without hearing the Clerks' Union, contrary to Transportation Communication Workers v. UNION PACIFIC RAILROAD COMPANY, 35 Law Week 4030, not officially reported.

(3) The decision runs contrary to consistent authority from this Board that no part of any agreement is to be considered "deadwood," but that all parts must be given meaning.

(4) The decision is contrary to the great preponderance of authority of this Board in similar cases.

(5) The decision reveals a basic and material misunderstanding of the facts in the case.

(6) The error is one which is far from harmless, in that the decision as it stands would entail payment of many thousands of dollars to individuals, some of whom are not identified, and none of whom are shown to have been damaged.

(7) The decision fails to recognize the law of the land with respect to damages.

**(1) This Board Did Not Have Jurisdiction To Make The Award.**

This case had been pending since November 1960. It was pending when the Carrier made a proper request under Section 3 Second of the Railway Labor Act as most recently amended by Public Law 89-456 to submit this case

14948                                8

to a Special Board of Adjustment. It so notified this Board, and correctly put us on notice that the case was no longer pending before us. In spite of this, the five Labor Members and the Referee erroneously and illegally adopted this Award.

(2) The Award Ignores The Vital Interest And Right Of The Clerks' Union, Which Is Also A Party To The Contract. It Takes Away From The Clerks' Work Which They Have Always Done And Gives It To The Telegraphers Contrary To The Express Language Of The Agreement, And Without Hearing The Clerks' Union, Contrary To TCW v. UNION PACIFIC, 35, LW 4030.

---

In the third from last paragraph, the Opinion espouses a correct principle —that specific terms of an agreement take precedence over general terms. For some reason, the specific terms of the July 27, 1953 Agreement have been treated as general, and vice versa. Agreements are so constructed, and rightly so, that the early paragraphs set forth the generalization, after which follow the specifics, such as exceptions and/or other special provisions. Such is precisely the case in the subject agreement. After the words "IT IS AGREED:" there follow two paragraphs, (a) and (b), which set forth broad and general terms. Paraphrasing them, they provide that telegraphers will do what they had been doing, and clerks will do what they had been doing. Had that been all the agreement was designed to provide, it would have ended there. However, there were some specific provisions added to modify, or serve as exceptions to the general terms. Paragraph (c) starts off with the word "except." If the majority had correctly applied the very principle they espoused, they would have been compelled to give precedence to that specific language in Paragraph (c) which reads:

"* * *, but may be connected to reperforators within the same city or terminal for transmission by telegraphers."

The word "but," in itself, implies an exception, and then follows an exception which permits the Carrier to do exactly what it did in the instant case. That this is what the Carrier did is shown throughout its submission and rebuttal, and is fully and properly recognized by the majority as is evidenced by that part of the second paragraph of the Opinion reading:

"Teletype machines were placed in operation in the Service Bureau on October 19, 1959. They replaced the typewriters. **They were connected to a reperforating machine in the Communications Department.**" (Emphasis ours.)

The record shows that the Service Bureau and the Communications Department are not only in the same "city or terminal," but are in the same building, only two floors apart. Thus when that portion of Paragraph (c) quoted above is matched with the emphasized portion of the Opinion last quoted, they fit "hand in glove." The Carrier did just what the Agreement calls for, it acted in strict compliance therewith.

Even though Paragraph (c) alone completely absolves the Carrier of any violation, note the further specific provisions of Paragraph (d), the pertinent part of which reads:

14948                                          9

"When such types of work now being otherwise performed are traditionally of the craft of Clerks and are compiled on printer telegraph machines (teletypes) and simultaneously transmitted to intra-city or intra-terminal points, or reperforated for transmission to other cities and/or terminals, such work will be performed by employes represented by the Clerks." (Emphasis ours.)

The Opinion correctly states that at the time the agreement was made the work of compiling the subject data was "now being otherwise performed," when it points out in the first and second paragraphs:

"Prior to October 19, 1959 a clerk in the Service Bureau typed in duplicate a report of cars * * *.

Teletype machines were placed in operation in the Service Bureau on October 19, 1959. They replaced the typewriters. They were connected to a reperforating machine in the Communications Department. Effective on that date, a clerk typed the report on the teletype machine in the Service Bureau. That teletype machine simultaneously caused the same message to be reproduced on a perforated tape by a reperforating machine in the Communications Department."

Once again, compare what the Opinion correctly states happened, with the language above quoted from Paragraph (d) and it is crystal clear that the Carrier did not only what the agreement says it may do, but also what it must do.

The clerk formerly compiled the data on a typewriter; then a teletype was substituted for the typewriter, and the same data was typed on the teletype and it was "simultaneously transmitted to intra-city or intra-terminal (actually intra-building) point(s)" and "reperforated for transmission to other cities." Therefore, the contract requires "such work will be performed by employes represented by clerks."

Here, the Carrier did only what the agreement said it must do. Petitioner should not be allowed to exact a penalty of some $40,000.00 or more from the Carrier, and take work from the clerks who are also protected by the same agreement, when the Carrier complied with the agreement. In fact, and as shown above, the Board's Opinion says the Carrier did exactly what the agreement says it may and must do.

(3) The Decision Runs Contrary To Consistent Authority From This Board That No Part Of Any Agreement Is To Be Considered "Deadwood," But That All Parts Must Be Given Meaning.

---

Cardinal rules of contract interpretation, recognized by this Board since its creation, dictate that any contract must be considered "from its four corners." See Awards 6856, 8571, 9447, 10166, 10785, 12648, 14415 and others.

It must be assumed that agreements are written by reasonable men, of reasonable intelligence, and reasonably qualified to perform the task in which engaged. This, in itself, negates any idea what "deadwood" or meaningless

14948          10

words or phrases would be incorporated into a contract. The Board has many times stated this principle, and it is a sound principle of law. The principle is well stated in Selections from Williston on Contracts:

> "The writing will be read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose." (Section 618.)

In applying this principle, it must be remembered that the clerks were present at the negotiation of the 1953 agreement, and they are signatory thereto. The Carrier is required to honor the portions of the agreement favorable to the clerks — not just the parts favorable to the telegraphers. Each of the three parties had their interests to protect, for which reason it is very important to give all parts of the agreement full meaning. Again to quote Williston:

> "The court will if possible give effect to all parts of the instrument and an interpretation which gives reasonable meaning to all its provisions will be preferred to one which leaves a portion of the writing useless or inexplicable; and if this is impossible an interpretation which gives effect to the main apparent purpose of the contract will be favored." (Section 619.)

The fact that the agreement before us is a tripartite agreement, between the Carrier, the Telegraphers and the Clerks, leaves no doubt about "the main apparent purpose of the contract," nor about the interpretation to be "favored."

Paragraphs (c) and (d) must be given their intended and obvious meaning. When this is done, the Carrier not only stands innocent, but in the position of having done exactly what it was required to do.

(4) The Decision Is Contrary To The Great Preponderance Of Authority Of This Board In Similar Cases.

---

Our Awards 3051, 8656, 9005, 9913, 10531, 11097, 11742, 12235, and 14692, as well as the precedent cited therein, show that the Carrier would not have been in violation of basic principles regarding intra-city communications, even if it had not had the added insurance afforded by Paragraphs (c) and (d) of the 1953 Agreement. Also see Award 24, SBA 269. Certainly, the Carrier should not be penalized for "abundance of caution." If Paragraphs (c) and (d) are not regarded as abundance of caution, they can then fall in but one category — exceptions and/or specific provisions superior to the general provisions of Paragraphs (a) and (b).

(5) The Decision Reveals A Basic And Material Misunderstanding Of The Facts In The Case.

---

In the second paragraph of Page 2 of the Opinion, we find the following:

> "The primary function of the teletype machine in the Service Bureau was to reproduce the message on perforated tape on a reperforating machine in the Communications Department. Typing the message was only an incidental part of the function."

14948                                11

That statement is the exact opposite of the true facts. The Opinion elsewhere correctly recognizes that the primary function was the typing of the reports which are used, as always, for many purposes, and in various departments — especially in the general office building where they are compiled. In the second paragraph, the Opinion correctly states:

> "They (teletype machines) replaced the typewriter."

Prior to installation of the teletype, clerks typed the reports. Subsequent to installation of the teletype, the clerks still type the reports. This shows what the primary function is — typing the report. It is the automatic and simultaneous punching of the tape by use of the reperforator which is the incidental part of the function, and this incidental function was done exactly as Paragraphs (c) and (d) of the agreement say it may (c), and must (d), be done.

Another misunderstanding of the facts is shown in the statement in the second paragraph of Page 2 reading:

> "Previously, Telegraphers only traditionally and customarily operated tape perforating machines."

That statement is erroneous and is contrary to the record, but even if it were true with respect to operation prior to the 1953 Agreement, it is a positive and undeniable fact that said agreements, Paragraphs (c), and (d), both permitted and dictated that clerks would do the work thereafter under the circumstances involved in this case.

The last sentence of the second paragraph of Page 2 reads as follows:

> "Operating a machine which reperforates a message on a tape and at the same time types it on paper is not work which belongs to clerks, but to Telegraphers under the July 27, 1953 Agreement."

Read Paragraphs (c) and (d) of the agreement, especially those positions quoted and emphasized herein, and it will be crystal clear that exactly the opposite is true.

The comments made thus far herein will prove the entire third paragraph of Page 2 of the Opinion is contrary to fact. Telegraphers certainly are assigned to each and every detail of the communication work. No one other than a telegrapher sends any communication outside the office building. Furthermore, the Carrier positively is not in error in saying that telegraphers do not have exclusive right to perforate tape. See the penultimate paragraph of Carrier's letter of May 24, 1957, ORT Exhibit No. 2, which, for ready reference, reads as follows:

> "Clerks are performing this kind of service on teletype machines at numerous locations and have been doing so for a long time. It is work definitely allocated to them by the Mediation Agreement."

That statement stands unrefuted, as does Carrier's statement on Page 3 of its Ex Parte Submission reading:

> "Printer telegraph machines have been in use on this property since the year 1927, during which time they have been operated by both clerks and telegraphers."

Those and other unrefuted statements by the Carrier constitute abundant proof. However, in addition to Carrier's statements, petitioner admits that clerks have always done such work. See Page 9 of their Ex Parte Submission, at which point they state:

> "Clerks in Dupo and other points in the Terminal area have prepared tapes for messages and reports when such were destined to terminal points only, and clerks have prepared tapes for 'wheel reports' for terminal destination as well as for points beyond the terminal."

Their admission stands, and their attempt to "water it down" fails for the very obvious reason that so is the work here involved subject to performance by clerks under the 1953 Agreement.

The third from last paragraph of the Opinion has been discussed earlier herein under Part 2. The correct principle is stated, but as has been clearly shown, it was applied in reverse.

The penultimate paragraph of the Opinion mentions only one Award, and then distinguishes it from the instant case by reference to the "special agreement." We have shown, and unmistakably so, that the "special agreement" is added insurance — not a liability.

The last paragraph of the Opinion, as has been shown herein, is positively in error. See, again, Paragraphs (c) and (d) of the 1953 Agreement.

(6) **The Error Is One Which Is Far From Harmless, In That The Decision As It Stands Would Entail Payment Of Many Thousands Of Dollars To Individuals, Some Of Whom Are Unidentified, And None Of Whom Have Been Shown To Have Been Damaged.**

Although the Carrier acted at all times strictly in accordance with the agreement, it is now placed in the position of having some $40,000.00 drained from its treasury — money which it does not owe to anyone. There is no evidence that any telegrapher has been displaced. Every job previously filled by telegraphers is still in existence.

(7) **The Decision Fails To Recognize The Law Of The Land With Respect To Damages.**

This reference to damages is made strictly without prejudice to our contention that the Award is invalid for the reasons stated above.

Petitioner has not shown that anyone was damaged, even if the agreement had been violated. Damages for breach of contract are measured by the actual loss caused by the breach. The laws of the land militate against any other payment not specifically provided by law or the contract itself. See Awards 12965, 13082, 13154, 13171, 13200, 13221, and 13477, among many others.

14948                                13

Damages are separate from the substantive aspects of the claim and must be proven as an independent element. The party pleading damages has the burden of proof, Award 14853. No loss has been demonstrated by what occurred here. Furthermore, Petitioner has failed to show that the work in dispute could not have been performed by employes on duty and under pay thus obviating a need for calling any additional employe. See Awards 4055, 6887, 8198, 9217, 9824, 10164, 12907, and 14112, culled from many.

For the reasons outlined, the award of damages in this docket is tantamount to a penalty. It has been consistently held that the Board is without authority to award any penalties in the absence of a provision for punitive damages in the collective bargaining contract. Brotherhood of Railroad Trainmen v. Denver & Rio Grande Western Railroad Co., 338 F. 2d 407, cert. den. 85 S. Ct. 1330; Brotherhood of Railroad Signalmen v. Southern Rwy., U. S. District Court for Middle District, North Carolina — No. C-9-G-65, not officially reported. Also see our Awards 12962, 13236, 13676, 13958, 14371, 14693, 14853, 14920 and 15062 and others.

In conclusion, the award is void because the Board lacked jurisdiction under Public Law 89-456. Also the Board failed to determine the rights of the clerks who were parties to the contract after having recognized that they were involved by giving the notice required by statute.

This claim has no support under the facts, agreement provisions, practices or precedent. The Special Tripartite Agreement expressly permits the change here in dispute and the distribution of work pursuant thereto.

T. F. Strunck
R. E. Black
P. C. Carter
G. L. Naylor
G. C. White

### REFEREE'S REPLY TO CARRIER MEMBERS' DISSENT TO AWARD 14948, DOCKET TE-12372

This Referee reluctantly files this reply to the dissent of the Carrier Members. Because the dissent is replete with technicalities and challenges the jurisdiction of this Division, clarification in support of the Award is necessary. Items (1) and (2) thereof need special consideration.

Carrier Members say that "(1) This Board did not have jurisdiction to make the Award." On April 21, 1966 the Chairman and Vice Chairman of the Third Division requested that this Referee be appointed as the neutral member of this Board to dispose of 51 deadlocked cases among which was listed Docket TE-12372. Pursuant thereto, the National Mediation Board issued a Certificate of Appointment on April 27, 1966 certifying the said 51 deadlocked cases to this Referee.

On June 20, 1966 a Carrier and a Labor Member of this Division ably presented their respective positions, argued their interpretations of the applicable tripartite agreement, and cited precedents in support thereof. After reviewing the record, the arguments and reading the citations, the Referee wrote his proposed Opinion and Award which was released to the Members on June 29, 1966.

14948                              14

Sometime thereafter, the Carrier Members made a request for reargument. A panel discussion on the re-argument was held on September 29, 1966, at which time the Carrier Member filed exhaustive briefs and raised substantive objections to the proposed Award identical with items (3) through (7) in the dissent. The Labor Member also participated and argued his position in support of the proposed Award. After reading the new briefs, examining the additional citations, and again reviewing the record, thus Referee reported to the Chairman that the proposed Award originally released on June 29, 1966 will not be changed.

The proposed Award was not scheduled for discussion by the Division until November 18, 1966, when it was adopted; nearly five months after it was first released and almost two months after the case was re-argued. And Docket TE-12372 was included on the calendar that day only after the Labor Members petitioned the Division to call a meeting for the purpose of considering the adoption of this case and five others then pending.

It should be noted that between June 29, 1966, when the proposed Award was first released to the Members, and November 17, 1966, this Division adopted thirty Awards proposed by this Referee; fifteen on July 29, 1966 and fifteen on October 28, 1966.

Not until a few days prior to November 18, 1966 did the Carrier request that this Docket be submitted to a Special Board of Adjustment under Section 3 Second of the Railway Labor Act, as amended.

The purpose and intent of Section 3 Second of the Railway Labor Act, as amended, is to provide procedures to further expedite the resolution of disputes which otherwise are within the jurisdiction of the National Railroad Adjustment Board. The parties were deadlocked on Docket TE-12372 certainly as of April 21, 1966, and it was contained in the Certificate of Appointment issued to this Referee. For nearly five months the Carrier Members knew of the contents of this Award. And it must be assumed that the involved Carrier also knew. Yet no request for a Special Board was made until shortly before November 18, 1966. If such a Special Board had been appointed, new hearings would have been scheduled and the final determination of the claim would have been further delayed.

Furthermore, if the Carrier's position is valid, then every proposed Award on the Third Division is subject to the same challenge. Any time one party or another is dissatisfied with a proposed Award they could request the appointment of such a Special Board and thus invalidate the jurisdiction of the Division. Section 3 Second of the Railway Labor Act, as amended, does not abolish the National Railroad Adjustment Board. Neither is it the intent of that amendment to deprive the Board of jurisdiction after a case has been argued and a proposed Award has been issued.

In Item (2) the dissent says that the Award is contrary to the decision of the United States Supreme Court in **Transportation Communication Workers v. Union Pacific Railroad Company**, 63 LRRM 2481 (25 Law Week 4030). In his Concurring Opinion, Mr. Justice Stewart says:

> "Until now the Adjustment Board has dealt with the claim of the telegraphers as though it were totally unrelated to the claim of the clerks. To take this piecemeal approach to the underlying causes of

this controversy not only invites inconsistent awards, but also ignores the industrial context in which the disputed contract was framed and implemented."

Award 14948 neither "invites inconsistent awards" nor does it ignore "the industrial context in which the disputed contract was framed." The Award is predicated upon a construction of an agreement between the Telegraphers, the Clerks and the Carrier. And the issue which the Board considered and upon which the Award was issued "was framed and implemented" in the tripartite agreement. The rights of all three parties were fully considered and the Award so indicates.

Such was not the case in the cited Supreme Court decision. There, only the agreement between the Telegraphers and the Carrier was considered by the Board and that Award was made on the meaning and intent of the agreement between those two parties alone.

Items (3) through (7) inclusive are almost identical with the matters contained in the briefs previously presented to the Referee and which were fully argued in two separate sessions. No purpose is to be served to reply in detail. The Award adequately sets out the basis for the findings. Suffice it only to say that whenever an agreement is violated, a remedy must follow. The remedy in this Award is proper and consistent with the violation.

David Dolnick<br>
David Dolnick,<br>
Referee

Keenan Printing Co., Chicago, Ill.    Printed in U.S.A.

14948